Lawrence W. CLAUSEN, Plaintiff,

v.

NATIONAL GRANGE MUTUAL IN-
SURANCE COMPANY, a foreign
corporation, Defendant.

C.A. No. 96C–11–073–WTQ.

Superior Court of Delaware,
New Castle County.

Final Submission Received: June 9, 1997.

Decided: Aug. 1, 1997.

David H. Erisman, Erisman & Curtin, Wilmington, for Plaintiff.

Robert J. Leoni, Mason, Ketterman, Morgan & Shelsby, Newark, for Defendant.

### OPINION ON PLAINTIFF'S MOTION TO COMPEL

QUILLEN, J.

### I. INTRODUCTION

At what point, if any, does an insured's bad faith action against his insurer permit the insured access to the insurer's claims file and to other materials relevant to the bad faith claim but to which the insurer asserts both the attorney-client privilege and the work product privilege? This is the core of the parties' dispute in the present Motion to Compel, which concerns discovery requests propounded by Plaintiff Lawrence W. Clausen ("Clausen") and objected to by Defendant National Grange Mutual Insurance Company ("National Grange"). The dispute pits competing interests against each other: the principle of liberal discovery, part of a court's search for the truth, against the old and established privilege protecting communications between attorney and client, and against the equally-established, if not quite as old, privilege protecting the work product of an attorney. Although the Delaware Supreme Court examined the attorney-client privilege and the work product doctrine as they relate to insurer back with actions in *Tackett v. State Farm Fire & Cas. Ins. Co.*, Del.Supr., 653 A.2d 254 (1995), the present dispute presents an opportunity to further examine these issues and define for this case the limits described in *Tackett*. The Court, therefore, has chosen to explore the issue at some length, including a look at the origins of the attorney-client privilege and work product doctrine and a look at what an insurance bad faith action means for both, at least in Delaware. There is a relationship, the Court submits, between the history and rationale of the privileges and the rationale which on occasion permits the privileges to be overridden.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Lawrence W. Clausen was injured in an accident on Chapel Street in Newark, Delaware on May 7, 1995. At the time of the accident, Clausen's vehicle was insured by National Grange Mutual Insurance Company. Clausen was injured in a second accident in New Jersey on December 22, 1995. He filed for personal injury protection ("PIP") benefits for injuries which he asserted arose from each accident and for lost wages which he alleged were the result of those injuries. The parties evidently came to a disagreement concerning each side's obligations and responsibilities, and

Clausen then filed the instant action, pursuing his PIP claims and asserting bad faith on the part of National Grange in its handling of his PIP claims.

The core allegation of the Complaint is that National Grange's alleged wrongful handling of Clausen's PIP claims was done without reasonable justification and in bad faith, in violation of National Grange's duty of good faith and fair dealing with respect to Clausen. Thus far, National Grange's only response to the allegations of no reasonable justification is contained in its Answer, which in routine fashion "denied" (among other things) that National Grange's actions were done without reasonable justification and in bad faith. The Answer also alleged as an affirmative defense that Clausen "failed to follow all terms and conditions of the [insurance] policy."

Clausen did not initially file any written interrogatories or requests for admissions, and instead directed his first request for production to National Grange in late January 1997. The request sought disclosure of the following items:

1. Your **complete** claims file or files relating to the personal injury protection claims at issue in this action, for the motor vehicle accidents occurring on May 7, 1995 in the State of Delaware and on December 22, 1995 in the State of New Jersey, whether maintained in the defendant's field office, regional office, home office or any other office.

2. All documents which explain how you processed and considered the plaintiff's personal injury protection claims at issue in this case . . . and all documents which explain why you rejected any claims for such coverage as of the filing of this lawsuit.

3. All performance planning and review documents pertaining to any of the adjusters involved in the personal injury protection claims . . . which are at issue in this case.

4. All hospital records, doctor's summaries and reports, reports concerning any physical tests performed on or concerning the injured plaintiff's past, present, or future physical condition insofar as such matters in writing may be in the possession, custody or control of the defendant, or defendant's attorney, upon request by him to any doctor, hospital or other person trained in the healing arts.

5. Copies of all surveillance records, reports, photographs or movies regarding the plaintiff.

Clausen's request for production asserted that disclosure of these materials was mandated by the Supreme Court's decision in *Tackett*. National Grange agreed to provide the documents sought in Request No. 4. As to the other four requests, National Grange objected to production on grounds of the attorney-client privilege and the work product doctrine. As to the first three requests alone, National Grange also objected on relevancy and undue burden grounds. By letter of February 13, 1997, counsel for Clausen informed defense counsel that he considered National Grange's objections to be unfounded, based on his understanding of the Supreme Court's decision in *Tackett*.

When National Grange did not produce the disputed documents, Clausen filed the present Motion to Compel Discovery. This Court heard the Motion on April 28, 1997 and reserved decision. An office conference followed on May 1, 1997, at which time the Court, with the cooperative agreement of counsel, orally directed National Grange to produce the objected-to documents to the Court for its *in camera* review. The Court received a copy of National Grange's claim file on June 11, 1997. By coincidence, the Court also signed an order for *in camera* production on June 11, 1997, which is being docketed on this date with related correspondence.

The production was well-packaged and provided documents through the date of the filing of the lawsuit. Many documents, approximately two and one-half inches thick, were in fact produced to Clausen,

but a hard core, approximately one-half inch thick, remains subject to the privilege claims. National Grange at the same time, by letter dated June 9, 1997, supplied to Clausen a privilege log breaking down the documents to which privilege is asserted into 28 separate items, the letter and log also having been supplied to the Court. The Court appreciates the approach taken by defense counsel in the *in camera* production. Given the view taken in this opinion, however, the *in camera* production order was at least premature and perhaps erroneous.

## III. THE ATTORNEY–CLIENT PRIVILEGE

The attorney-client privilege is said by some to have had its origins in Roman law. Perhaps beginning with the doctrine of *testimonium domesticum,* in which a servant or slave was incompetent to testify against his master, an advocate (*patronus* ) was incompetent to testify as a witness in any case in which he had acted. *See* Max Radin, *The Privilege of Confidential Communication Between Lawyer and Client,* 16 Cal.L.Rev. 487, 497–88 (1928) ("Radin");[1] John William Strong, ed., *McCormick on Evidence* § 87 (4th ed. 1992) ("*McCormick on Evidence* "). The basis for the exclusion rested upon the general moral duty of fidelity between family members, and the perception that allowing such testimony by a servant, who was essentially part of the Roman's family, violated that familial fidelity. Radin, *supra,* at 488. Such notions of moral opprobrium, however, were not the only rationales. Rather, there was the underlying suspicion, because of the Roman emphasis on familial fidelity, that a family member, servant, or advocate had too strong a motive to testify in favor of the family member, whatever the truth. *Id.* Moreover, there was the suspicion that an individual who cared so little for familial fidelity that he would break that bond and testify

against his family member or master was a person of little honor or repute and therefore not worthy of belief. *Id.* These latter rationales have some parallel in the history of testimonial capacity.

There is little in the way of documentary evidence to demonstrate the influence, if any, which the Roman doctrine had on the development of the English rule. *Id.* at 489. In any event, the privilege in England can be traced back to the late sixteenth century, to the reign of Queen Elizabeth I. *See* 8 Wigmore, *Evidence* § 2290 (McNaughton rev.1961). As Wigmore argues it, the privilege probably developed as an exception to the right of testimonial compulsion, which itself did not arise until early in Her Majesty's reign. *Id.* One of the first reported applications of the privilege is said to be the case of *Berd v. Lovelace,* Ch., Cary 62, 21 Eng.Rep. 33 (1577). Thomas Hawtry, a solicitor, was served with a subpoena to testify as to his knowledge touching upon the cause before the Court. It turned out, however, that Hawtry was a solicitor in the very suit before the Court and had "received several fees of the defendant." Because of his interest in the case, the Court held that he should not be compelled to be deposed on any matter in the cause before the Court. *Id.* Even more interesting than the *Berd* Court's recognition of the privilege is the fact that use of the privilege already appeared to be well settled. 8 Wigmore, *Evidence* § 2290.

Interestingly enough, and perhaps this is what gives rise to the speculation concerning the Roman influence on the English privilege, the privilege in England in those early days was based on the honor of the attorney. 8 Wigmore, *Evidence* § 2290; Radin, *supra,* at 489; *McCormick on Evidence* § 87; Note, *The Attorney–Client Privilege: Fixed Rules, Balancing and Constitutional Entitlement,* 91 Harv. L.Rev. 464, 465 (1977). It was believed that the honor of the attorney as an En-

---

**1.** The Radin article is quoted at length in a decision of the Court in *State v.* 62.96247

*Acres of Land,* Del.Super., 193 A.2d 799 (1963).

glish gentleman did not permit him to violate his client's confidences. 8 Wigmore, *Evidence* §§ 2286, 2290. By the late eighteenth century, however, this rationale lost its force, as it came to be seen that there was no moral opprobrium in violating confidences because of the law's compulsion in an effort to seek the truth. *Id.* at § 2290. It was replaced by a newer rationale, one that had coexisted with the older one since the early eighteenth century. *Id.* at § 2290 n. 3. This rationale, of course, is our modern one—the privilege exists because clients must be able to disclose fully and freely to their attorney all of the facts and circumstances surrounding a case without fearing that the attorney's knowledge could be used against them. 8 Wigmore, *Evidence* § 2290; Radin, *supra,* at 490; *McCormick on Evidence* § 87; 81 Am.Jur.2d *Witnesses* § 338; Note, *The Lawyer–Client Privilege,* 56 Nw.U.L.Rev. 235 (1961).

The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence. Adequate legal representation in the ascertainment and enforcement of rights or the prosecution or defense of litigation compels a full disclosure of the facts by the client to his attorney.

*City and County of San Francisco v. Superior Court,* Cal.Supr., 37 Cal.2d 227, 231 P.2d 26, 30 (1951).[2]

The change in rationale also signaled a change in the focus of the attorney's privilege. When the privilege was based on a gentleman's honor, the privilege belonged to the attorney—it did not exempt the client, it could be waived by the attorney, it was limited to communications made only since the beginning of the case, and it ended with the conclusion of the litigation. 8 Wigmore, *Evidence* § 2290. Once the privilege was based on notions of public policy, the possession of the privilege shifted from the attorney to the client. *Id. See also* 81 Am.Jur.2d *Witnesses* § 344. As it developed under the common law, the privilege applied under the following circumstances:

(1) [T]he asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Mach. Corp.,* D.Mass., 89 F.Supp. 357, 358–59 (1950). *See also* 8 Wigmore, *Evidence* § 2292; 81 Am.Jur.2d *Witnesses* §§ 357, 363–77. The scope of the privilege was rather narrow, and appeared to exist only for communications made by the client to the attorney or his subordinate. However, Wigmore notes that language notwithstanding, an attorney's communication to his client was also within the privilege:

That the *attorney's communications* to the client are also within the claim of privilege was always assumed in the earlier cases and has seldom been brought into question. The reason for it is not any design of securing the attorney's freedom of expression, but the necessity of preventing the use of his statements as admission of the client, or as leading to inferences of the tenor of the client's communications—although in this latter

---

2. It has also been suggested by some authorities that the privilege also rests on an individual's right to privacy, but this rationale has never achieved much recognition in the courts. *See McCormick on Evidence* § 87 nn. 9–11.

aspect, being hearsay statements, they could seldom be available at all.

8 Wigmore, *Evidence* § 2320 (internal citations omitted).

Delaware shared in this exposition and development of the common law, *see Texaco, Inc. v. Phoenix Steel Corp.,* Del.Ch., 264 A.2d 523, 524 (1970), but the privilege was reaffirmed, expanded, and partially taken out of the common law by the adoption of Delaware Uniform Rule of Evidence 502 in 1980:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendering of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and representative of the client, or (5) among lawyers and their representatives representing the same client.

D.R.E. 502(b). This Rule of Evidence goes beyond any narrow view of the common law rule, by affirming the view espoused by Wigmore and covering *all* communications *between* attorney and client that are intended to be confidential and are made for the purposes of facilitating the rendering of legal services. *See Ramada Inns, Inc. v. Dow Jones & Co., Inc.,* Del.Super., 523 A.2d 968, 971–72 (1986); *McCormick on Evidence* §§ 88–92. Like its common law predecessor, the current privilege cannot be used in the furtherance of a crime or fraud, D.R.E. 502(d)(1), and it can waived, D.R.E. 510.

■ The issue of waiver is an important part of the attorney-client privilege. Under D.R.E. 510, voluntary disclosure by the privilege holder (the client) or consent to disclosure of any significant part of the privileged matter operates as a waiver of the privilege. *Texaco, Inc.,* 264 A.2d at 525; *see also Interfaith Hous. Del., Inc. v. Town of Georgetown,* D.Del., 841 F.Supp. 1393, 1398 (1994). The waiver may be implicit and, unlike the usual definition of waiver derived from voluntary conduct, may even be contrary to the privilege holder's actual intent. *Tackett,* 653 A.2d at 259. "There is always the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended the result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." 8 Wigmore, *Evidence* § 2327. *See also Tackett,* 653 A.2d at 259; *Baio v. Commercial Union Ins. Co.,* Del.Supr., 410 A.2d 502, 507–08 (1979); *Hercules, Inc. v. Exxon Corp.,* D.Del., 434 F.Supp. 136, 156 (1977); *McCormick on Evidence* § 93; 81 Am.Jur.2d, *Witnesses* § 348.

## IV. THE WORK PRODUCT DOCTRINE

■ In contrast to the modern attorney-client privilege, the work product doctrine (privilege) is one belonging to the attorney rather than the client. *Riggs Nat'l Bank of Washington, D.C. v. Zimmer,* Del.Ch., 355 A.2d 709, 714 (1976) (citing *Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 4th Cir., 487 F.2d 480 (1973)). The work product privilege is closely tied to the attorney-client privilege, in that there is a public policy interest in protecting an attorney's privacy and enabling an attorney to work without interference in preparing a client's case. *Riggs Nat'l Bank,* 355 A.2d at 714–15. The rationale underlying the work product privilege was succinctly explained by the United States Supreme Court fifty years ago:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a

lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.... This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways.... Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interest of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

Prior to *Hickman*, the federal courts and those state courts which had adopted the federal discovery rules could not agree on the extent to which an attorney's work product was the proper subject of discovery. *See Mullins v. Vakili*, Del.Super., 506 A.2d 192, 194 (1986); 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure: Civil* § 2021 (1994) ("*Federal Practice & Procedure* "). In answering the question, the *Hickman* Court recognized a qualified privilege under Federal Rule of Civil Procedure 26(b), a privilege in which discovery was premised on a showing of necessity or justification. *Federal Practice & Procedure* § 2021.

We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and

non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment or corroboration. And production might be justified when the witnesses are no longer available or can be reached only with difficulty. Were production of written statements and documents to be precluded under such circumstances, the liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning. But the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order.

*Hickman*, 329 U.S. at 511–12, 67 S.Ct. 385. The Court drew a further distinction for work product that reflected an attorney's mental impressions or opinions, giving such particular work product, for all practical purposes, absolute immunity from discovery. *Id. See also Mullins*, 506 A.2d at 194.

■ In 1970, the federal discovery rules were amended, in large part to codify the work product doctrine as announced in *Hickman* and interpreted by the lower courts in subsequent cases. *Mullins*, 506 A.2d at 194. *See also Federal Practice & Procedure* § 2023. Rule 26, as amended, was adopted in this State and became effective on July 1, 1970. In pertinent part, it establishes the following limits on the discovery of an attorney's work product:

Subject to the provisions of subdivision (b)(4) of this Rule [regarding expert witnesses], a party may obtain discovery

of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering the discovery of such materials when the required showing has been made, the Court shall protect against disclosure the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Super.Ct.Civ.R. 26(b)(3). Materials sought to be protected must be written by a representative of the party (including the attorney), *Mullins,* 506 A.2d at 195, "specifically in preparation for threatened or anticipated litigation," *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 782 (1993) (citing *Riggs Nat'l Bank,* 355 A.2d at 715). An attorney's involvement is not necessary in order to give protection to materials as having been prepared in anticipation of litigation, but documents prepared only in the ordinary course of business are not within the purview of Rule 26(b)(3). *Mullins,* 506 A.2d at 195–96 (citing *Roeper v. Greggo & Ferrara, Inc.,* Del.Super., C.A. No. 77–OC–108, Christie, J. (Aug. 28, 1978)).

As the Rule indicates, work product is divided into two general categories: (1) "factual" work product, and (2) "opinion" work product, the material containing an attorney's mental impressions, conclusions, opinions, or legal theories. *Mullins,* 506 A.2d at 194 (citing 4 *Moore's Federal Practice* (1980 ed.) at 26–361, 362). The language of the Rule suggests an absolute privilege against disclosure of opinion work product, but our Supreme Court has held that this mandatory language does not establish "an impenetrable barrier to discovery of opinion work product." *Tackett,* 653 A.2d at 262. Rather, the Rule provides "additional" protection of opinion work product. "[I]n order to obtain mental impressions under Rule 26(b)(3), the mental impressions must be directed to the pivotal issue in the current litigation and the need for the material must be compelling." *Id.*

Finally, it should be noted that because the work product privilege only provides qualified immunity from disclosure, it provides a lesser degree of protection than does the attorney-client privilege. *Tackett,* 653 A.2d at 262. At the same time, however, it covers a greater amount of material than does the attorney-client privilege, subject of course, to disclosure on the showing of substantial need by an opposing party. *Id.* (citing *Moody v. Internal Rev. Serv.,* D.C.Cir., 654 F.2d 795, 798 (1981)). How these differences between the two privileges play out in the context of insurance "bad faith" litigation is the subject of the next section.

## V. THE ATTORNEY–CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE IN INSURANCE "BAD FAITH" LITIGATION

An insurance policy is a contract between the insurer and the insured. Like most contracts, insurance policies include an implied covenant of good faith and fair dealing. An insurer who acts in bad faith in dealing with a claim may incur liability not only for damages under the policy but for uncovered economic losses of the insured, the insured's emotional distress damages, attorney's fees, and punitive damages. Actions seeking recovery for bad faith under first-party medical, disability, casualty, and life policies are a relatively recent development and an increasingly common cause of action. *Tackett,* 653 A.2d at 261; Alan O. Sykes, *"Bad Faith" Breach of Contract by First–Party*

*Insurers*, 25 J. Legal Stud. 405, 406 (1996) ("Sykes"). A first-party insurance policy is in essence a contract by which the insurer promises to pay a sum or sums of money to the insured under certain conditions. Sykes, *supra*, at 408. In first-party actions, an insured alleges that the insurer refused, without sufficient justification, to pay benefits owed under the policy, thereby forcing the insured to litigate to obtain them. Sykes, *supra*, at 406. The plaintiff-insured attempts to show the absence of a reasonable basis for paying benefits, along with the defendant-insurer's knowledge or reckless disregard of the fact that it lacked a reasonable basis for denying the claim. Sykes, *supra*, at 411. The *Tackett* opinion recently examined the attorney-client and work product privileges in the context of insurer "bad faith" litigation, and its analysis is instructive here.

### A. The Attorney–Client Privilege in Insurer "Bad Faith" Litigation

With regard to the attorney-client privilege, the Delaware Supreme Court noted that "[a] party cannot force an insurer to waive the protections of the attorney-client privilege merely by bringing a bad faith claim." *Tackett*, 653 A.2d at 259. At the same time, however, when "an insurer makes factual assertions in defense of a claim which incorporate, expressly or implicitly, the advice and judgment of its counsel, it cannot deny an opposing party 'an opportunity to uncover the foundation for those assertions in order to contradict them.' " *Id.* (omitting internal citation). This is an extension of the general principles of waiver of the attorney-client privilege. *Id. See also Hercules, Inc.*, 434 F.Supp. at 156; *Sealy Mattress Co. of New Jersey v. Sealy*, Del.Ch., C.A. No. 8853, 1987 WL 12500, Jacobs, V.C. (June 19, 1987), Letter Op. at 14.

■ All this simply begs the question of what factual assertions in defense of a claim which incorporate, expressly or implicitly, the advice of counsel, waive the attorney-client privilege. In *Tackett*, the insureds' Complaint alleged that the insurer's denial of their claim lacked reasonable justification. In its Answer, the insurer (State Farm) denied any unreasonable justification and asserted as an affirmative defense that the insureds (the Tacketts) had failed to supply information necessary for their claim to be processed. In the course of discovery, State Farm was asked to set forth the facts in support of its claim of reasonable justification for nonpayment of the claim. State Farm relied upon the affidavit of its counsel that he had reviewed the claim file and found that it showed routine handling of the Tacketts' claim. The Supreme Court found that State Farm's reliance upon the communications with counsel contained in the claim file constituted partial disclosure, and therefore waiver, of otherwise protected facts. *Id.* at 259–60. The Supreme Court was careful to limit its holding to situations where the insurer "makes factual representations which implicitly rely upon legal advice as justification for non-payment of claims." *Id.* at 260. Bringing a "bad faith" action does not in and of itself waive the privilege, nor does filing an answer which denies an unreasonable justification for non-payment and alleges an affirmative defense of the insured's failure to supply necessary information. However, it *will* waive the privilege *if* the insurer relies upon the advice of its counsel as justification for non-payment and routine claim handling.

### B. The Work Product Doctrine in Insurer "Bad Faith" Litigation

As the Supreme Court noted in *Tackett*, insurer "bad faith" actions create a dilemma in the application of Civil Rule 26(b)(3).[3] There is the desire to protect an attorney's freedom to "develop a client's

---

**3.** The Court also noted that the issue has received much discussion in the scholarly press. *See Tackett,* 653 A.2d at 261 n. 2.

case without undue interference from opposing counsel," which conflicts with the fact that "bad faith" claims against an insurer usually cannot be proven "without sufficient access to the claim file which frequently contains opinion work product." *Tackett,* 653 A.2d at 261. As noted in Part IV, *supra,* Rule 26(b)(3) requires, among other things, a showing of "substantial" need for factual work product, and a showing of a "more substantial" or "compelling" need for the disclosure of opinion work product. *Tackett,* 653 A.2d at 261–62. The *Tackett* Court also addressed what constitutes a "compelling need" in insurer bad faith cases:

> The processing of a claim by an insurer is almost entirely an internal operation and its file reflects a unique, contemporaneous record of the handling of the claim. The need for such information "is not only substantial, but overwhelming." *Brown* [*v. Superior Court,* Ariz.Supr., 137 Ariz. 327, 670 P.2d 725, 734 (1983) ]. The Tacketts' claim for bad faith and State–Farm's affirmative reliance on the "routine handling" of the case implicated the *entire* claim file (without excluding advice of counsel), thus creating a compelling need to discover the full context in which State Farm handled their claim. A contrary finding would require a plaintiff, and the Court, to accept as true the insurer's assertions that it handled the claim in a proper manner.

*Id.* at 263. The foregoing suggests that disclosure of a claims file may become the norm rather than the exception, given the "unique" nature of the claims file. Perhaps sensitive to this, and recognizing the "presumptive confidentiality" of the opinion work product in the claims file, the Supreme Court directed that production of such materials should not be ordered without an *in camera* examination by the trial court, but only after the trial court has required "a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim." *Id.* Only after that showing is made should the trial court "exercise its discretion in reviewing the materials and requiring production under the compelling need standard." *Id.*

The importance of such a showing is heightened by the institutional role of trial judges. As this case illustrates, referring such matters to a trial judge for an *in camera* review is hardly a cure-all. Indeed, such referral is troublesome. First, Delaware State Trial Judges are busy; Civil Division Judges in the Superior Court have approximately 900 cases assigned to each Judge. Second, it is difficult for a Judge to interrupt the norm of a trial day and quickly digest the complexity of the factual issues of a significant document production case in the context of a claim of privilege, and yet discovery matters need to be expedited. In a recent case, where the production request was much narrower than here and *in camera* examination was ordered, this Court expressed further reservations:

> The only answer to these dilemmas seems to me to lie in the *in camera* examination by the Court. As a Judge, I do not like that answer. In effect, we are asking a Judge who has not been exposed to the entire case in a motion context on limited paperwork to make the decision of an advocate on the merits of value of the material. The Judge performing that function does not know the thought process of the plaintiff's counsel and may be of a temperament totally unsuited for an advocate, either generally or specifically in bad faith cases. But, if there is going to be any meaningful preservation of the privileges, the ball realistically ends up in the Judge's court and we might as well face that fact head on in the first instance and make a judgment after viewing the material. Thus, while I do not relish the role, I have appreciated the way counsel have presented the issue in this case.

*Kemper Ins. v. Soligo,* Del.Super., C.A. No. 95C–08–266–WTQ, 1996 WL 944919, Quillen, J. (May 9, 1996). These dilemmas emphasize the importance of a process which narrows the Court's inquiry to a specific focus on specific documents; otherwise, in situations like this case, the Court could be asked to undertake voluminous·review, well beyond the one-half inch of documents here.

## VI. APPLICATION OF THE ATTOR-NEY–CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE IN THIS CASE

In light of the foregoing, the Court is not inclined to compel production at this time of the materials to which National Grange claims privilege. It is generally clear to the Court that the claims of privilege to the 28 items (Item 12 being missing) is not frivolous, although the Court does have a little difficulty with the privilege claims relating to Items 6, 16, and 21.[4] It is unnecessary at this point to ascertain which privilege National Grange claims as to each of the withheld materials, as this Court finds that Clausen has not made a showing at this stage of the litigation sufficient to justify abrogating either the attorney-client or work product privileges. The Court notes that the entire exercise has resulted in the disclosure to Clausen of a workable privilege log, which should prove useful if further application for production is made.

■ Both the attorney-client and work product privileges are long standing, well grounded in public policy, and not yet to be taken lightly. Notwithstanding Clausen's assertions to the contrary, *Tackett* does not mandate abrogation of these doctrines and disclosure of the entire claims file in the present case at the present time. As to the attorney-client privilege, it is important to remember that the *Tackett* Court took great pains to state that there is no *per se* waiver of the privilege in

insurer bad faith cases. *Tackett,* 653 A.2d at 260. It is only when the insurer makes "factual representations which implicitly rely upon legal advice as justification for non-payment of claims" that the privilege is waived. *Id.* This has not occurred in the matter before the Court. Aside from National Grange's Answer, in which it denied having no reasonable justification for its actions and asserted an affirmative defense of Clausen's failure to follow the policy's procedures, there is *nothing* in the record that could fairly be said to constitute a factual representation by National Grange similar to the one made by State Farm in *Tackett.* To hold that the rather routine answer by National Grange constitutes a waiver of the attorney-client privilege would in effect accomplish that which the *Tackett* Court said must not be done: finding a *per se* waiver of the privilege merely by filing a complaint alleging insurer bad faith.

■ The same must be said for the work product privilege. The *Tackett* Court took great pains to point out that merely bringing an insurer bad faith action does not justify abrogating the work product privilege any more than it justifies abrogating the attorney-client privilege. With regard to "opinion" work product, plaintiff must show a "more substantial need" for the materials, in that the mental impressions sought must be directed to the "pivotal issue" in the case and the need for the material must be "compelling." *Tackett,* 653 A.2d at 262. In *Tackett,* the Supreme Court noted that it was the combination of the Tacketts' claim of bad faith *and* State Farm's "affirmative reliance on the 'routine handling' of the case" through an attorney's affidavit that implicated the entire claims file and created a compelling need to discover the full context in which the claim was handled, including the mental impressions of State Farm's agents and employees. *Id.* at 263. In the case at bar, Clausen has thus far

4. If the privilege log intended to suggest discreet sets of log notes, this does not seem to

be the case; moreover, there appears to be a gap after page 39 up to page 44.

failed to demonstrate that the mental impressions are directed to the pivotal issue in this case, nor has National Grange yet made an affirmative reliance on routine handling similar to the one made by State Farm. The reason for this is simple: unlike the situation which the Superior and Supreme Courts apparently faced in *Tackett,* the Court here has before it a relatively new record. Aside from the materials related to the present Motion, the only substantive documents in the record are the Complaint and the Answer. Prior to July 22, 1997, neither plaintiff nor defendant propounded any interrogatories or made any requests for admissions. With such a sparse record before it, the Court is not prepared to find that National Grange has waived the protections of the attorney-client and work product privileges.

## VII. CONCLUSION

One of the goals of the Supreme Court's decision in *Tackett* was to make sure that a plaintiff in a bad faith action not be able to go on an expedition into the envisioned "gold mine"[5] that is the claims file just on the basis of a complaint and answer. It may very well be possible, given the Supreme Court's recognition of the uniqueness of the claims file in an insurer bad faith action, that subsequent events in this case will demonstrate a waiver of the attorney-client privilege or a compelling need for production of the claims file. But at the present time, production is not mandated and in camera review, notwithstanding its occurrence, is not even justified. Plaintiff Lawrence W. Clausen's Motion to Compel is DENIED without prejudice to renewal at a later date as to individual items in the privilege log. IT IS SO ORDERED.

---

5.    *See* Thomas E. Workman, *Plaintiff's Right to the Claim File, Other Claim Files and Related Information: The Ticket to the Gold Mine,* 24 Tort & Ins. L.J. 137 (1988), *cited in Tackett,* 653 A.2d at 261 n. 2.