583 S.E.2d 80

STATE of West Virginia ex rel. MEDICAL ASSURANCE OF WEST VIRGINIA, INC., Petitioner,

v.

The Honorable Arthur M. RECHT, Judge of the Circuit Court of Ohio County; The Estate of Marjorie I. Verba, by Sally Jo Nolan, Executrix, Respondents.

No. 30840.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 14, 2003.

Decided April 30, 2003.

Concurring Opinion of Justice Davis May 30, 2003.

Concurring Opinion of Justice Albright June 17, 2003.

Dissenting Opinion of Justice McGraw July 2, 2003.

Concurring Opinion of Chief Justice Starcher July 11, 2003.

458

Jeffrey M. Wakefield, Esq., Michelle Marinacci, Esq., Flaherty, Sensabaugh & Bonasso, Charleston, for Medical Assurance of West Virginia, Inc.

Robert P. Fitzsimmons, Esq., Russell J. Guthrie, Esq., Fitzsimmons Law Offices, Wheeling, David N. Dittmar, Esq., Zagula & Dittmar, Weirton, for Estate of Marjorie I. Verba.

Heather Heiskell Jones, Esq., Mary Molly August, Esq., for Amicus Curiae West Virginia Insurance Federation.

Dale A. Buck, Esq., E. Kay Fuller, Esq., for Amici Curiae Nationwide Mutual Insurance Company, Progressive Paloverde Insurance Company, and American Insurance Association.

MAYNARD, Justice.

In this original proceeding for a writ of prohibition, this Court is asked to prevent the enforcement of the September 19, 2002, order of the Circuit Court of Ohio County which directed the relator and defendant below, Medical Assurance of West Virginia, Inc., to produce its complete investigative and claim files in connection with the underlying medical malpractice claim of respondent and plaintiff below, the Estate of Marjorie I. Verba. The relator alleges that these files contain information protected by the attorney-client privilege, work product doctrine, and quasi attorney-client privilege. For the reasons set forth below, we grant the writ of prohibition.[1]

## I.

## FACTS

Dr. David A. Ghaphery performed antireflux surgery on Marjorie Verba on February 21, 1996. Within several hours of Ms. Verba's release from the hospital four days later, she died. An autopsy indicated that a surgical nick resulted in a laceration to her stomach which caused Ms. Verba to contract peritonitis and to die as a result.

Ms. Verba's estate, respondent herein and plaintiff below ("Respondent"), brought a medical malpractice action against Dr. Ghaphery. A jury awarded $300,000 for physical pain, mental pain, and loss of enjoyment of life; $21,000 for medical and funeral bills; and $2,500,000 to the beneficiaries of Ms. Verba's estate under the wrongful death statute.[2] The trial court reduced the award to conform to the medical malpractice cap on noncompensatory damages found in W.Va. Code § 55–7B–8 (1986).[3] Respondent appealed the reduction and challenged the constitutionality of the one million-dollar cap. In *Verba v. Ghaphery*, 210 W.Va. 30, 552 S.E.2d 406 (2001), this Court upheld the cap's constitutionality.

Following the favorable jury verdict and prior to the appeal, Respondent was granted leave to amend its complaint to allege that the relator herein and defendant below, Medical Assurance of West Virginia, Inc., Dr. Ghaphery's medical liability insurer, committed unfair claim settlement practices in violation of W.Va.Code § 33–11–4(9).[4] Specifically, Respondent alleged that the relator did not perform an adequate investigation; liability was reasonably clear throughout the underlying malpractice claim; and the relator rejected Respondent's offer of settlement of

---

1. At this point, we acknowledge the valuable contribution of *amici* West Virginia Insurance Federation, Nationwide Mutual Insurance Company, Progressive Paloverde Insurance Company, and American Insurance Association who submitted briefs to this Court.

2. *See* W.Va.Code §§ 55–7–5—55–7–7.

3. According to previous W.Va.Code § 55–7B–8, which is applicable to the instant case, "[i]n any medical professional liability action brought against a health care provider, the maximum amount recoverable as damages for noneconomic loss shall not exceed one million dollars and the jury may be so instructed." This code section was amended effective March 5, 2003, to reduce the maximum amount recoverable as compensatory damages for noneconomic loss to

$250,000 per occurrence or $500,000 where the damages for noneconomic losses suffered by the plaintiff were for: (1) wrongful death; (2) permanent and substantial physical deformity, loss of use of a limb or loss of a bodily organ system; or (3) permanent physical or mental functional injury that permanently prevents the injured person from being able to independently care for himself or herself and perform life sustaining activities. Again, the amendment has no bearing on the instant case.

4. The statute which prohibits unfair claim settlement practices, W.Va.Code § 33–11–4(9), is part of the Unfair Trade Practices Act, W.Va.Code §§ 33–11–1, *et seq.*

one million dollars plus medical expenses, and made no offer in return. The unfair claim settlement practices or "bad faith" action[5] was stayed and bifurcated pending resolution of the appeal after which the stay was lifted and discovery commenced.[6]

Pursuant to discovery in the bad faith action, Respondent requested, among other things:

(2) The *complete* investigative files and claims files (including their original folders and binders and all documents therein) of Medical Assurance in connection with the underlying claim of plaintiff arising from the malpractice claims, including, but not limited to, claims files maintained by adjusters, claims files maintained by claims examiners, claims files maintained by district or regional offices and claims files maintained by the home office of Medical Assurance. These files are to be produced in their entirety, in their original state, complete with original file jacket and any notes or attachments thereto.

(4) All memoranda, diary entries, notes or other writings, recordings and/or other data entries which in any way document and/or record discussions between any representative of Medical Assurance and any other person relating to the claims made on behalf of plaintiff arising out of the underlying claim.

(11) Any and all statements of witnesses, potential witnesses or interested parties relating in any way to the subject matter of plaintiff's Amended Complaint.

(17) All e-mail documents and computer documents, whether reduced to hard copies or not, which in any way relate to the handling of the underlying claim.

The relator responded that a general request for materials and files as that contained in Request number 2 is improper under this Court's opinion in *State ex rel. Allstate Ins. Co. v. Gaughan,* 203 W.Va. 358, 508 S.E.2d 75 (1998). The relator also asserted various privileges including the attorney-client privilege of the insured, opinion and fact work product, and the quasi attorney-client privilege of the relator. Documents in the files, created up through the resolution of post-verdict motions in the medical malpractice action, which the relator considered non-privileged were produced. Documents considered privileged were not produced but were identified by the relator in a 52–page "Privilege Log."

Respondent subsequently moved to compel production of all the documents requested. Following a hearing, the Circuit Court of Ohio County, by order dated September 19, 2002, granted Respondent's motion and directed the relator to fully respond to the requests for production of documents and deliver the documents to Respondent's counsel on or before September 30, 2002. The circuit court further ruled that,

Defendant Medical Assurance shall not be permitted to withhold the production of any documents requested by said requests for production of documents based upon any claim of privilege with the exception that defendant may object to producing any document which was exclusively between Steptoe & Johnson and Defendant David Ghaphery, M.D., and was not received by and/or reviewed by Defendant Medical Assurance, and all documents falling within this objection shall be produced to this Court *in camera* for inspection and all such documents shall be identified by its identifying information, together with the specific reason for objecting to production.

**5.** For easy reference, we will refer to Respondent's statutory action for unfair claim settlement practices as a "bad faith" action. We realize, however, that "there is actually a technical distinction between a 'bad faith' claim and an 'unfair settlement practices' claim. The phrase 'bad faith' was developed to describe the common law action against an insurer. The phrase 'unfair settlement practices' was developed to describe the statutory action against an insurer. Because the statutory claim actually includes the elements of a cause of action for the common law claim, our cases use the two phrases interchangeably." *Light v. Allstate Ins. Co.,* 203 W.Va. 27, 30 n. 5, 506 S.E.2d 64, 67 n. 5 (1998) (citations omitted).

**6.** This case was filed prior to the Legislature's elimination of third-party bad faith claims against insurers of health care providers. *See* W.Va.Code § 55–7B–5(b) (2001).

Shortly thereafter, the relator presented to this Court its petition praying for a writ of prohibition to be directed against the Circuit Court of Ohio County and the Estate of Marjorie I. Verba. This Court issued a rule to show cause, and we now grant the writ.

## II.

## STANDARD OF REVIEW

 The general standard for issuance of the writ of prohibition is set forth in W.Va.Code § 53–1–1 (1923) which states that "[t]he writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." This Court has held that "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for [a petition for appeal] or certiorari." Syllabus Point 1, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953). The relator herein does not claim that the circuit court has no jurisdiction but rather that it has exceeded its legitimate powers.

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all

five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996).

 "A writ of prohibition is available to correct a clear legal error resulting from a trial court's substantial abuse of its discretion in regard to discovery orders." Syllabus Point 1, *State Farm v. Stephens*, 188 W.Va. 622, 425 S.E.2d 577 (1992). Also, "[w]hen a discovery order involves the probable invasion of confidential materials that are exempted from discovery under Rule 26(b)(1) and (3) of the West Virginia Rules of Civil Procedure, the exercise of this Court's original jurisdiction is appropriate." Syllabus Point 3, *State ex rel. USF & G v. Canady*, 194 W.Va. 431, 460 S.E.2d 677 (1995). Further, "[u]nless obviously correct or unreviewably discretionary, rulings requiring attorneys to turn over documents that are presumably prepared for their clients' information and future action are presumptively erroneous." Syllabus Point 6, *Canady, id.* Finally,

> Quite clearly, a circuit court's ruling on discovery requests is reviewed for an abuse of discretion; but, where a circuit court's ruling turns on a misinterpretation of the West Virginia Rules of Civil Procedure, our review is plenary. "The discretion that is normally given to a trial court's [procedural] decisions does not apply where 'the trial court makes no findings or applies the wrong legal standard[.]' "

*Canady*, 194 W.Va. 431, 439, 460 S.E.2d 677, 685, *quoting McDougal v. McCammon*, 193 W.Va. 229, 238, 455 S.E.2d 788, 797 (1995), *quoting State v. Farley*, 192 W.Va. 247, 253, 452 S.E.2d 50, 56 (1994).

Applying these standards to the case before us, we first conclude that the discovery order at issue involves a probable invasion of confidential materials and work product. Although we do not have the documents at issue, we have a copy of the privilege log in which the various documents are described by the relator. Our review of the privilege log leads us to conclude that at least some of

the documents sought by Respondent are probably protected by attorney-client privilege or the work product doctrine. Therefore, because of the probable invasion of confidential materials, this Court's original jurisdiction is appropriate. Second, for the reasons discussed in Subsection 3 of this opinion, we find that the circuit court's ruling turns on its application of the wrong legal standard. Further, the circuit court's use of the wrong legal standard was its sole reason for ordering the production of the documents at issue. Accordingly, we have no choice but to grant the writ of prohibition prayed for by the relator.

## III.

## DISCUSSION

1. *Traditional Attorney–Client Privilege and Work Product Principles*

First, we find that upon any reconsideration of Respondent's motion to compel, the circuit court shall apply traditional attorney-client privilege and work product principles in determining whether the documents sought by Respondent should be produced. At this point, we will discuss these principles.

### A. *Attorney–Client Privilege*

The attorney-client privilege applies to communications between Steptoe & Johnson and Dr. Ghaphery. This privilege protects litigants during discovery as set forth in Rule 26(b) of the West Virginia Rules of Civil Procedure which provides in pertinent part:

Discovery scope and limits.—Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(1) In general.—Parties may obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It

is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. (Emphasis added).

Thus, according to Rule 26(b), generally parties may not obtain discovery of privileged matters.

■■■ This Court has described the attorney-client privilege as "a common law privilege that protects communications between a client and an attorney during consultations." *State ex rel. John Doe v. Troisi*, 194 W.Va. 28, 35–36, 459 S.E.2d 139, 146–47 (1995) (citations omitted). "Communications made in confidence either by an attorney or a client to one another are protected by the privilege." *Canady*, 194 W.Va. at 441, 460 S.E.2d at 687 (footnote omitted). In other words, the "privilege protects the substance of communications[.]" *Troisi*, 194 W.Va. at 36, 459 S.E.2d at 147 (footnote omitted). Communications are protected whether they are made verbally or in writing, including electronic mail messages and facsimile transmissions. 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 5–4(E)(2)(b), p. 5–107 (4th ed.2000); *see also Canady*, 194 W.Va. at 443, 460 S.E.2d at 689 ("Both the electronic mail message and the facsimile transmission similarly seem to be protected by the attorney-client privilege.").

■■■ The attorney-client privilege also "extends to others who are advised of confidential information at the direction of the attorney." *Troisi*, 194 W.Va. at 36, 459 S.E.2d at 147 (citations omitted). "[T]herefore, the privilege extends to protect communication between the attorney and the agents, superiors, or attorneys in joint representation." *Id.* (Citations omitted). Significantly, "among those considered a representative of the lawyer is an insurance company's investigator who takes a statement from an insured to assist the insurance company's lawyer in defending a possible claim against the insured." 1 Cleckley, *Handbook on Evidence*, § 5–4(E)(5), p. 5–129. Therefore, the circuit court erred in its September 30, 2002, order when it ruled that only communications between Steptoe & Johnson and Dr.

Ghaphery, which were not received and/or reviewed by Medical Assurance, are protected by attorney-client privilege. Privileged communications between Steptoe & Johnson and Dr. Ghaphery remain privileged even if shared with Dr. Ghaphery's liability insurer.

■■■■ "The burden of establishing the attorney-client privilege or the work product exception, in all their elements, always rests upon the person asserting it." Syllabus Point 4, *Canady, supra.*

In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from the attorney in his capacity as a legal advisor; (3) the communication between the attorney and client must be intended to be confidential.

Syllabus Point 2, *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129 (1979). Finally, "there must be no evidence that the client intentionally waived the privilege." *Troisi,* 194 W.Va. at 36 n. 11, 459 S.E.2d at 147 n. 11 (citation omitted). "A party may waive the attorney-client privilege by asserting claims or defenses that put his or her attorney's advice in issue." Syllabus Point 8, *Canady.*

In the event the circuit court reconsiders Respondent's motion to compel, the circuit court is directed to apply the above attorney-client privilege principles in assessing the discoverability of the specific documents sought by Respondent.

### B. Work Product

■■■■ Where the attorney-client privilege does not apply, material sought by Respondent may still be protected by the work product doctrine. This doctrine "historically protects against disclosure of the fruits of an attorney's labor [and] is necessary to prevent one attorney from invading the files of another attorney." *Canady,* 194 W.Va. at 444, 460 S.E.2d at 690. Under the work product rule, "an attorney is not required to divulge, by discovery or otherwise, facts developed by his efforts in preparation of the case or opinions he has formed about any phase of the litigation[.]" *In re Doe,* 662 F.2d 1073, 1077

(4th Cir.1981), *modification on other grounds recognized by In re Grand Jury Proceedings,* 33 F.3d 342 (4th Cir.1994). The rule governing work product is found in W.Va.R.Civ.P. 26(b)(3), which states, in pertinent part:

Trial preparation: materials. Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

■■■■ By its express terms, Rule 26(b)(3) defines work product as "documents and tangible things ... prepared in anticipation of litigation or for trial[.]" According to Syllabus Point 8, in part, of *In re Markle,* 174 W.Va. 550, 328 S.E.2d 157 (1984), "[t]he limitation in Rule 26(b)(3) of the West Virginia Rules of Civil Procedure is against obtaining documents and other tangible things used in trial preparation." We have also held that "[t]o determine whether a document was prepared in anticipation of litigation and, is therefore, protected from disclosure under the work product doctrine, the primary motivating purpose behind the creation of the document must have been to assist in pending or probable future litigation." Syllabus Point 7, *State ex rel. United Hosp. v. Bedell,* 199 W.Va. 316, 484 S.E.2d 199 (1997).

■■■■ The work product doctrine differs from attorney-client privilege in that work product protections are not absolute. "While

the work product doctrine creates a form of qualified immunity from discovery, it does not label protected material as 'privileged' and thus outside the scope of discovery under Rule 26(b)(1), *W.V.R.C.P.*" *State ex rel. Chaparro v. Wilkes,* 190 W.Va. 395, 397, 438 S.E.2d 575, 577 (1993). Rather, "Rule 26(b)(3) of the West Virginia Rules of Civil Procedure makes a distinction between factual and opinion work product with regard to the level of necessity that has to be shown to obtain their discovery." Syllabus Point 7, *In re Markle, supra.*

 "Fact work product [7] is discoverable only 'upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship.'" *Chaudhry v. Gallerizzo,* 174 F.3d 394, 403 (4th Cir.1999), *quoting In re Grand Jury Proceedings,* 33 F.3d 342, 348 (4th Cir.1994) (footnote added).

Where factual work product is involved, the question of what constitutes "substantial need" and "undue hardship" has been frequently litigated in the federal courts. It is now well established that this standard is met where a witness is no longer available for questioning or is hostile and refuses to give a statement or has a faulty memory and can no longer remember the details of the event in question. Discovery has also been allowed where crucial information was in the exclusive control of the opposing party.

Although the cost of obtaining depositions may be relevant, it is seldom, if ever, sufficient in itself to constitute "undue hardship."

*In re Markle,* 174 W.Va. at 557, 328 S.E.2d at 163–64 (citations omitted). Also, "[w]hat hardship is 'undue' depends on both the alternate means available and the need for continuing protection from discovery." *State ex rel. Chaparro v. Wilkes,* 190 W.Va. at 398 n. 2, 438 S.E.2d at 578 n. 2 (citations omitted).

In the instant case, pursuant to Rule 26(b)(3), the respondent is entitled to apply to the circuit court to examine the attorneys' *fact* work product, not the attorneys' *opinion* work product, generated for but not by the attorneys, upon the proper showing of need. In addition, upon the proper showing of need, the respondent is entitled to discover from Medical Assurance's investigative files all fact work product which shows or tends to show Medical Assurance's internal processes in evaluating the underlying claim against Dr. Ghaphery. Of course, documents may be redacted to omit any excluded material.

 Opinion work product consists of "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." W.Va.R.Civ.P. 26(b)(3). It "is even more scrupulously protected as it represents the actual thoughts and impressions of the attorney[.]" *In re Grand Jury Proceedings,* 33 F.3d 342, 348 (4th Cir.1994). In fact, "opinion work product enjoys a nearly absolute immunity and can be discovered in only very rare and extraordinary circumstances." *State ex rel. United Hosp. v. Bedell,* 199 W.Va. at 328, 484 S.E.2d at 211, *quoting Republican Party of North Carolina v. Martin,* 136 F.R.D. 421, 429 (E.D.N.C.1991), *aff'd in part, rev'd in part and remanded on other grounds,* 980 F.2d 943 (4th Cir.1992) (*quoting In re Doe,* 662 F.2d 1073, 1080 (4th Cir. 1981).) This Court has instructed that " efforts to obtain disclosure of opinion work product should be evaluated with particular care." *Canady,* 194 W.Va. at 445, 460 S.E.2d at 691 (citation omitted). Accordingly, should the issue be raised again below, the circuit court should use special care in evaluating efforts to obtain the opinion work product of Dr. Ghaphery's attorneys.

 Finally, as with the attorney-client privilege, the work product protection of Steptoe & Johnson is not negated simply because the documents were received and/or reviewed by the defendant's insurer. Rule 26(b)(3) specifically provides that documents

---

7. "Factual work product may be defined as the information or materials gathered or assembled by a lawyer in anticipation of litigation not falling under the category of opinion work product."

*State ex rel. Chaparro v. Wilkes,* 190 W.Va. 395, 397 n. 1, 438 S.E.2d 575, 577 n. 1 (1993), *citing* 4 *Moore's Federal Practice* P. 26.64 at 26–361, 362 (1980 ed.).

prepared in anticipation of litigation or by or for the party's representative, "including the party's ... insurer[,]" are discoverable only upon the proper showing. We have explained that "[t]he purpose of Rule 26(b)(3) is to narrow the ability to obtain trial preparation material by expanding the coverage of the work product rule to include persons other than an attorney." Syllabus Point 6, in part, *In re Markle*, 174 W.Va. 550, 328 S.E.2d 157 (1984). "Thus it [is] now ... clear that a report from the insured to the insurer is within the immunity as also [are] statements obtained by investigators for the insurer." *In re Markle*, 174 W.Va. at 556, 328 S.E.2d at 162, *quoting* 8 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2024 at 202–07 (1970).

Therefore, if the circuit court is called upon to reconsider Respondent's motion to compel, it is directed to apply the work product rules set forth above in order to determine whether the documents sought by Respondent should be produced.[8]

## 2. Viability of a Balancing Test To Determine the Discoverability of Privileged Materials

■ During oral argument, counsel for Respondent asserted that, if this Court finds that the circuit court erred, we should adopt a balancing test similar to the one formulated in *Gaughan, supra*, whereby Respondent may obtain privileged documents upon a showing of compelling need. Respondent contends that a balancing test is necessary because a claim file is a unique, contemporaneously prepared history of its handling of a claim that cannot be discovered by other means but that is absolutely necessary to prove the elements of a bad faith cause of action. According to Respondent, the compelled production of otherwise privileged material will not have a chilling effect on attorney-client communications because every attorney involved in these types of cases knows that his or her opinions are likely to be disclosed. For the following reasons, we decline to create the exception to the attorney-client privilege urged on us by Respondent.[9]

■ First, a balancing test governing the discovery of privileged communications is inconsistent with Rule 26 of the West Virginia Rules of Civil Procedure which concerns the scope of discovery. According to Rule 26(b)(1), "[p]arties may obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action[.]" (Emphasis added.) Under the rule's plain terms, privileged material is not discoverable.

In clear language, Rule 26 provides that privileged matters, although relevant, are not discoverable. As a result of this rule, many documents that could very substantially aid a litigant in a lawsuit are neither discoverable nor admissible as evidence. In determining what privileges or protections are applicable, we are obligated to look both at the rules themselves and to our common law.

*Canady*, 194 W.Va. at 441, 460 S.E.2d at 687 (citation and footnote omitted). Therefore,

---

8. As noted above, the relator also claims the protection of the quasi attorney-client privilege articulated in *Gaughan*. However, *Gaughan* expressly applies where the insured has signed a release of his or her claim file to a third-party litigant. These are not the facts in the instant case. Also, see footnote 9, *infra*.

9. Respondent's efforts to apply *Gaughan* as a fallback position are actually misguided. In *Gaughan*, the insured executed a release which allowed the plaintiff to have access to the insured's claim file. Because the claim file was created for the insured, the insured could waive all privileges attached to the claim file—which was done by the release that was executed. Under this unique set of facts, it became necessary to provide the insurer with some protection against disclosure of privileged information in the claim file, because the insured had waived the attorney-client privilege by authorizing a third party to have access to the claim file. In providing the insurer some protection, we created a quasi privilege which could be penetrated upon a showing of compelling need. In the instant case, the insured has not authorized release of his claim file to Respondent. Consequently, there has been no waiver of the attorney-client privilege by the insured. Since there has been no waiver in the case, the attorney-client privilege is fully in effect. As we indicate in the body of this opinion, this Court will not break with centuries of precedent, to create an exception to the common law attorney-client privilege, by applying *Gaughan's* fact specific balancing test.

there is no provision under our Rules of Civil Procedure for the discovery of privileged material.

 Second, using a balancing test to govern the discoverability of privileged communications is unknown to the common law. "When the [attorney-client] privilege is applicable ... it is absolute." *Gaughan,* 203 W.Va. at 372 n. 21, 508 S.E.2d at 89 n. 21, *quoting* 1 Cleckley, *Handbook On Evidence,* § 5–4(E)(3) (3d ed.1994). This is consistent with the United States Supreme Court's "reject[ion] ... of a balancing test in defining the contours of the [attorney-client] privilege." *Swidler & Berlin v. United States,* 524 U.S. 399, 409, 118 S.Ct. 2081, 2087, 141 L.Ed.2d 379, 388 (1998) (citations omitted). It is also consistent with "[t]he overwhelming majority of courts support[ing] the view that if the essential conditions for the applicability of the privilege are met, the privileged communications will be permanently protected unless the privilege is waived by the client." 1 Scott N. Stone & Robert K. Taylor, *Testimonial Privileges* § 1.01 at p. 1–7 (2d ed.1995) (footnote omitted). We simply do not believe that a significant deviation from the common law which would be applicable only in third-party bad faith insurance cases is desirable or necessary.

Third, our research suggests that there is no precedent for using a balancing test to determine the discoverability of privileged material in third-party bad faith claims. Of the small minority of states that recognize the right of a third-party plaintiff to bring a bad faith action against the insured-defendant's insurance company,[10] it appears that only Florida and Montana courts have addressed the issue of the discoverability of attorney-client privileged material in an insurer's claim file in the context of third-party bad faith claims. Neither of these states created a balancing test to determine the discoverability of privileged material, and only the Florida court permitted discovery of the claim file. Significantly, the approach taken by the Florida court in *Dunn v. National Security Fire and Cas. Co.,* 631 So.2d 1103 (Fla.Dist.Ct.App.1993), was rejected by this Court in *Gaughan.*

Respondent avers, however, that discovery of privileged material in the insurer's files is necessary to prove the elements of a bad faith cause of action.[11] We disagree. In

---

**10.** Unlike West Virginia, the majority of states do not recognize a right to bring a private cause of action under their unfair claim settlement practices statutes. According to Stephen S. Ashley, in *Bad Faith Actions: Liability and Damages* § 9:03, pp. 9–9—10 (1997), "[t]hough a few states have agreed with the conclusion that the unfair claims settlement practices statutes support private claims, most have rejected private causes of action." (Footnote omitted). Ashley lists as those states which recognize private causes of action, Arizona, Connecticut, Florida, Kentucky, Montana, New Hampshire, New Mexico, North Carolina, North Dakota, Texas, and West Virginia.

Among these states, only a handful recognize *third-party* bad faith claims based on their unfair claims settlement practices statutes. According to *Gaughan,* 203 W.Va. at 369, n. 15, 508 S.E.2d at 86 n. 15, "[m]ost courts which have considered a third-party bad faith action have not allowed such a third-party claim against a tortfeasor's insurer." (Citation omitted). This is in accord with Paul R. Rice, *A Quasi–Attorney–Client Privilege? West Virginia's Mislabeled Fiduciary Duty Exception,* 101 W.Va. L.Rev. 311, 314 (1998) which says, "[b]ecause the third-party action involves a plaintiff to whom the insurance company did not owe a contractual duty under the insurance policy, most state jurisdictions that have addressed the issue have refused to find an

implied statutory duty under legislative schemes similar to those in West Virginia." (Footnote omitted).

**11.** Several of the cases cited by Respondent to support its assertion that bad faith actions can only be proved by access to the claim file are first-party bad faith cases in which the courts did not consider the attorney-client privilege of the insured. *See Brown v. Superior Court,* 137 Ariz. 327, 670 P.2d 725 (Ariz.1983); *Clausen v. National Grange Mut. Ins. Co.,* 730 A.2d 133 (Del.Super.Ct.1997); *Tackett v. State Farm Fire and Cas. Ins. Co.,* 653 A.2d 254 (Del.Super.Ct.1995); *Robarge v. Patriot Gen. Ins. Co.,* 42 Conn.Supp. 164, 608 A.2d 1134 (1992) (third-party plaintiff subrogated to the rights of the insured by statute); and *Bartlett v. John Hancock Mut. Life Ins. Co.,* 538 A.2d 997 (R.I.1988), *abrogated on other grounds by Skaling v. Aetna Ins. Co.,* 799 A.2d 997 (R.I.2002). Two of the cases do not address attorney-client privilege but rather the discoverability of opinion work product under the Rules of Civil Procedure. *See Holmgren v. State Farm Mut. Auto. Ins. Co.,* 976 F.2d 573 (9th Cir.1992) and *Morrow v. Brown, Todd & Heyburn,* 957 S.W.2d 722 (Ky.1997). Finally, in *Escalante v. Sentry Ins.,* 49 Wash.App. 375, 743 P.2d 832 (1987), *disapproved of on other grounds by Ellwein v. Hartford Acc. and Indem. Co.,* 142

*State ex rel. USF & G v. Montana Second Judicial Dist.*, 240 Mont. 5, 783 P.2d 911 (1989), the Montana court rejected a third-party's efforts to discover the insurer's files in a bad faith action and explained:

> Plaintiffs contend that the privilege must give way in the context of bad faith litigation because the plaintiff must be able to determine whether the insurance company had a good faith basis for its decision. They urge that the requisite information includes knowledge of reliance on advice of counsel, and that if discovery is not permitted in the present case it will render the Unfair Trade Practices Act ineffectual. Plaintiff contends that the nature of the cause of action should control discoverability. We disagree and conclude that it is the nature of the relationship which is determinative.

> Plaintiffs contend that their inability to discover these communications will impede the policy behind the Unfair Trade Practices Act. We conclude that the opposite is true. The attorney-client privilege allows for an honest, careful and prompt analysis by qualified persons. This enables the insurer to evaluate and settle a claim expeditiously and in this way furthers the policy behind the Act. The free flow of information between the attorney and client equally benefits the claimant because it is this kind of communication which results in the settlement of most insurance claims.

> Normally, all communications between attorney and client, including conversations and phone calls, are memorialized in writing. If these writings are all potentially discoverable, the impact on an attorney's ability to fully advise a client would be devastating. An insurance company must have an honest and candid evaluation of a case, possibly including a "worst case scenario." A concern by the attorney that

communications would be discoverable in a bad faith suit would certainly chill open and honest communication. An attorney's inability to communicate freely with the client would impede all communications and could diminish the attorney's effectiveness. It could also impede settlements. We conclude that the need for the privilege outweighs any alleged need of the plaintiffs.

*Montana Second Judicial Dist.*, 240 Mont. at 12–13, 783 P.2d at 915–16. This Court concurs with the reasoning of the Montana court.[12]

■ Further, even though Respondent does not have access to privileged materials, it still may engage in the evidence-gathering process. For example, non-party witness interviews do not implicate attorney-client privilege. Respondent may even depose the insured.

> The attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question "What did you say or write to the attorney?" and may not refuse to disclose any relevant fact within knowledge merely because s/he incorporated a statement of such fact into her communication to her attorney. Courts have repeatedly noted that a party cannot conceal a fact merely by revealing it to her lawyer.

1 Cleckley, *Handbook On Evidence*, § 5–4(E)(1), 5–105 (footnotes omitted). Finally, while the insurer's investigative materials are protected by work product, these materials are discoverable upon the proper showing pursuant to Rule of Civil Procedure 26(b)(3).

Wash.2d 766, 15 P.3d 640 (2001), the court held that the parents of a deceased automobile passenger covered under the uninsured motorist policy of the automobile's owner must show a foundation in fact for the charge of civil fraud in order to overcome the insurer's privilege. Civil fraud is not alleged in the instant case. In sum, we do not find any of these cases helpful to our analysis.

12. This Court's rejection of *Montana Second Judicial Dist.* in *Gaughan* was limited to the extent "it provides an insurer with all the protections of the attorney-client privilege with respect to an insured's claim file in third-party bad faith actions." *Gaughan*, 203 W.Va. at 372, 508 S.E.2d at 89. In the instant case, in contrast, we are concerned with the attorney-client privilege of the insured.

Accordingly, we do not find it necessary to create a novel rule which would permit, in certain third-party bad faith cases, the discovery of privileged communications.

### 3. Inapplicability of Honaker v. Mahon to the Instant Case

Having set forth above the proper legal standard for determining the discoverability of the documents at issue, we deem it necessary to briefly explain our finding that the circuit court utilized an improper standard in ruling on Respondent's motion to compel. The transcript of the hearing on the motion to compel indicates that the circuit court based its decision to compel the production of the documents at issue on footnote 8 of *Honaker v. Mahon*, 210 W.Va. 53, 62, 552 S.E.2d 788, 797 (2001), which says, in part, that "[a]n insurance company owes its own policyholders a duty ... to refrain from statutory unfair claim settlement practices.... [T]hese duties are not delegable, and insurance companies are therefore responsible for the actions of the attorneys they employ." (Citations omitted). The circuit court interpreted the footnote language to mean that little or no privilege attaches to communications between the insured, his or her lawyer, *and* the insurer in third-party bad faith insurance cases.[13] Accordingly, the circuit

court ruled that the relator would not be permitted to withhold from production, based on claims of privilege, any documents requested by the plaintiff, with the exception of communications exclusively between Dr. Ghaphery and his lawyers.

This Court has held, however, that "... [n]ew points of law ... will be articulated through syllabus points as required by our state constitution." Syllabus Point 2, in part, *Walker v. Doe*, 210 W.Va. 490, 558 S.E.2d 290 (2001). If this Court were to create a new exception to attorney-client privilege, it would do so in a syllabus point and not in a footnote. Second, language in a footnote generally should be considered obiter dicta which, by definition, is language "unnecessary to the decision in the case and therefore not precedential." *Black's Law Dictionary* 1100 (7th ed.1999). Third, the statement in footnote 8 of *Honaker* is in a discussion about an insurance company's duty to *its own policyholders*, not third parties.[14] Finally, we believe the circuit court's reading of the *Honaker* footnote is inconsistent with the lawyer's ethical obligation to represent the insured under Rule of Professional Conduct 5.4(c).[15] Therefore, we conclude that the language in footnote 8 of *Honaker v. Mahon* does not govern the dis-

**13.** In *Gaughan*, 203 W.Va. at 369–70, 508 S.E.2d at 86–87, this Court explained:

> For definitional purposes, a first-party bad faith action is one wherein the insured sues his/her own insurer for failing to use good faith in settling a claim brought against the insured or a claim filed by the insured. A third-party bad faith action is one that is brought against an insurer by a plaintiff who prevailed in a separate action against an insured tortfeasor. In the bad faith action against the insurance company the third-party alleges the insurer insurance company engaged in bad faith settlement in the first action against the insured tortfeasor.

> (Footnotes and citation omitted).

**14.** When read in context, the *Honaker* footnote says that an insurer's duties of good faith and fair dealing and to refrain from statutory unfair claim settlement practices are not delegable and are applicable to the attorneys employed by the insurers. The instant case, however, concerns a third-party bad faith claim, and this Court has indicated that there is a substantial difference in the duties owed by an insurer to policyholders as opposed to third parties. For example, insurers

owe no common law duty of good faith and fair dealing and no fiduciary duty to third parties. Thus, this Court has held that "[a] third party has no cause of action against an insurance carrier for common law breach of the implied covenant of good faith and fair dealing or for common law breach of fiduciary duty." Syllabus, *Elmore v. State Farm*, 202 W.Va. 430, 504 S.E.2d 893 (1998).

**15.** According to Rule of Professional Conduct 5.4(c), "[a] lawyer shall not permit a person who ... employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services." The insurer hires the attorney to represent the insured and it is the obligation of the lawyer to diligently represent the insured with commitment, dedication and zeal. *See* W.Va.R.Prof.Cond. 1.3, comment. Therefore, a rule that says that an attorney hired to represent the insured is also an agent of the insurer so that the insurer is responsible for the actions of the attorney is inequitable to both the insured and the insurer. It also puts the lawyer in the difficult and potentially impossible position of acting on the behalf of both the insurer and the insured.

coverability of materials allegedly protected by the attorney-client privilege.

## IV.

## CONCLUSION

In conclusion, we have found that the circuit court used the wrong legal standard in ordering the discovery of the allegedly privileged information sought by Respondent. We have also declined Respondent's request that we create an exception to attorney-client privilege, such as a balancing test, whereby privileged information may be discovered. Accordingly, we issue the writ of prohibition prayed for by the relator, and we prevent the enforcement of the circuit court's September 19, 2002, order. Finally, any further proceedings on Respondent's motion to compel discovery shall be conducted by the circuit court in accord with traditional attorney-client privilege and work product principles set forth in Rule 26(b) of the Rules of Civil Procedure and the decisions of this Court.

Writ Granted.

Chief Justice STARCHER concurs.

Justice DAVIS concurs.

Justice ALBRIGHT.

Justice MCGRAW dissents.

DAVIS, J., concurring.

(Filed May 30, 2003)

I wish to make it clear that, not only do I concur in the majority's disposition of this case, "I agree entirely with Justice [Maynard's] analysis of the legal issues presented here and with his application of them to the facts of this case." *Woodall v. International Bhd. of Elec. Workers*, 192 W.Va. 673, 678, 453 S.E.2d 656, 661 (1994) (Cleckley, J., concurring). I have chosen to write separately on the crime-fraud exception to the attorney-client privilege as it is an issue that I believe

trial courts will be confronting now that the Court has made clear that the attorney-client privilege and work product rule [1] can be asserted in third-party insurance bad faith cases. Justice Maynard's opinion identified the issue in footnote 11, when he stated that "fraud is not alleged in the instant case." Nevertheless, it is my belief that the crime-fraud exception will, in fact, be a recurring matter in insurance bad faith claims. Consequently, I write separately to explore its contours.

## 1. THE CRIME–FRAUD EXCEPTION IN GENERAL

In the early decision of *State v. Douglass*, 20 W.Va. 770 (1882), this Court "indicated that the attorney-client privilege was justified on the 'grounds of public policy, because greater mischiefs would probably result from requiring or permitting ... [disclosures], than from wholly rejecting them.'" Franklin D. Cleckley, *A Modest Proposal: A Psychotherapist–Patient Privilege for West Virginia*, 93 W. Va. L.Rev. 1, 33 (1990) (quoting *Douglass*, 20 W.Va. at 780). Although public policy demands clothing communications between an attorney and his/her client with a privilege, "it is [well] settled under modern authority that the [attorney-client] privilege does not extend to communications between attorney and client where the client's purpose is the furtherance of a future intended crime or fraud." 1 Kenneth S. Broun et al., *McCormick on Evidence* § 95, at 380 (John W. Strong ed., 5th ed.1999) (footnote omitted). Thus, "[o]ne of the more important exceptions to the attorney-client privilege is the 'crime-fraud' exception." *Grassmueck v. Ogden Murphy Wallace*, 213 F.R.D. 567, 572 (W.D.Wash.2003). Under this exception "if such communications were made in order to perpetrate a [crime or] fraud on justice, they are not privileged[.]" Syl. pt. 2, in part, *Thomas v. Jones*, 105 W.Va. 46, 141 S.E. 434

---

**1.** "The crime-fraud exception also applies to materials otherwise protected by the work product doctrine." *In re Grand Jury Investigation*, 437 Mass. 340, 772 N.E.2d 9, 21 n. 28 (2002). *See also In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir.1979) ("The work product privilege is perverted if it is used to further illegal activities as is the attorney-client privilege, and there

are no overpowering considerations in either situation that would justify the shielding of evidence that aids continuing or future criminal activity."); *Ocean Spray Cranberries, Inc. v. Holt Cargo Sys., Inc.*, 345 N.J.Super. 515, 785 A.2d 955, 959 (Law Div.2000) ("The work-product privilege is also subject to the 'crime-fraud' exception.").

(1928). As noted by Justice Cardozo, "[a] client who consults an attorney for advice that will serve him in the commission of a [crime or] fraud will have no help from the law." *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933). *See also In re Grand Jury Investigation*, 437 Mass. 340, 772 N.E.2d 9, 21 (2002) ("No public interest is served by permitting a client to use the attorney-client privilege to help him or her break the law.").

Courts have recognized that "[t]he crime-fraud exception to the attorney-client privilege is predicated on the recognition that where the attorney-client relationship advances the criminal enterprise or fraud, the reasons supporting the privilege fail." *People v. Paasche*, 207 Mich.App. 698, 525 N.W.2d 914, 917 (1994). "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989) (citations omitted). *See also In re Grand Jury Proceedings*, 183 F.3d 71, 76–77 (1st Cir.1999) ("[W]e exclude from the privilege communications made in furtherance of crime or fraud because the costs to truth-seeking outweigh the justice-enhancing effects of complete and candid attorney-client conversations."); *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir.1997) ("The crime-fraud exception removes the privilege from those attorney-client communications that are 'relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.' "); *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996) ("While there is a societal interest in enabling clients to obtain complete and accurate legal advice . . . there is no such interest when the client consults the attorney to further the commission of a crime or fraud.").

The crime-fraud "exception applies even if the attorney is unaware of the client's criminal or fraudulent intent, and applies of course where the attorney knows of the forbidden goal." *Ocean Spray Cranberries, Inc. v. Holt Cargo Sys., Inc.*, 345 N.J.Super.

515, 785 A.2d 955, 959 (Law Div.2000). *See also United States v. Hodge & Zweig*, 548 F.2d 1347, 1354 (9th Cir.1977) ("The crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of such an improper purpose."); *Freedom Trust v. Chubb Group of Ins. Cos.*, 38 F.Supp.2d 1170, 1171 (C.D.Cal.1999) ("[T]he lawyer does not have to be aware of the fraud for the crime-fraud exception to apply."); *In re National Mortg. Equity Corp. Mortg. Pool Certificates Litig.*, 116 F.R.D. 297, 300 (C.D.Cal.1987) ("[T]he party seeking disclosure need not show that the attorney knowingly participated in the crime or fraud."). Thus, "[t]he determining factor is not the attorney's intention or actions; for purposes of analyzing the crime-fraud exception, the attorney's conduct and motive is irrelevant." *In re Grand Jury Investigation*, 437 Mass. 340, 772 N.E.2d 9, 25 (2002). Further, "[t]he client need not succeed in committing the intended crime or fraud in order to forfeit the attorney-client privilege. The dispositive question is whether the attorney-client communications are part of the client's effort to commit a crime or perpetrate a fraud." *First Union Nat'l Bank v. Turney*, 824 So.2d 172, 187 (Fla.Dist. Ct.App.2001)

Generally,

under the crime/fraud exception to the lawyer-client privilege, "fraud" would include the commission and/or attempted commission of fraud on the court or on a third person, as well as common law fraud and criminal fraud. The crime/fraud exception comes into play when a prospective client seeks the assistance of an attorney in order to make a false statement or statements of material fact or law to a third person or the court for personal advantage.

*Volcanic Gardens Mgmt. Co. v. Paxson*, 847 S.W.2d 343, 348 (Tex.Ct.App.1993). With regard to the "fraud on the court" component of the crime-fraud exception, we stated in dicta in *Kessel v. Leavitt*, 204 W.Va. 95, 511 S.E.2d 720 (1998), that "only a crime or a fraud *upon the court* will suffice to overcome the attorney-client privilege." *Kessel*, 204 W.Va. at 183, 511 S.E.2d at 808. This discus-

sion was limited to the specific factual context under consideration in that case, which involved fraud upon the court, and was based upon the observation that " '[m]ost of the decisions fashioning a fraud exception have dealt with a client's use of an unwitting attorney to carry out a scheme to fraudulently or criminally subvert the normal progress of litigation[.]' " 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 5–4(E)(6)(a) (1994) (quoting *In re Doe,* 662 F.2d 1073 (4th Cir.1981)). In light of the narrow circumstances under which the crime-fraud exception was placed in issue in *Kessel,* our decision therein should not be interpreted as limiting the crime-fraud exception to only that of fraud upon the court.

## 2. DIVERSITY IN THE SCOPE OF THE FRAUD EXCEPTION

An issue that has resulted in little uniformity among courts involves the scope of the "fraud" component of the crime-fraud exception. As one court has observed, "[t]he word 'fraud' could be given its ordinary meaning, that is, common-law civil fraud. On the other hand, 'fraud' might mean any tort which involves some element of planning." *Milroy v. Hanson,* 902 F.Supp. 1029, 1032–33 (D.Neb.1995). The diversity in the scope of the fraud exception is most easily demonstrated by reviewing how courts have treated the term. For example, one court has held that " '[a]cts constituting fraud are as broad and as varied as the human mind can invent. Deception and deceit in any form universally connote fraud. Public policy demands that the 'fraud' exception to the attorney-client privilege ... be given the broadest interpretation.' " *Fellerman v. Bradley,* 99 N.J. 493, 493 A.2d 1239, 1245 (1985) (quoting *In Re Callan,* 122 N.J.Super. 479, 300 A.2d 868 (Ch. Div.1973), *rev'd on other grounds,* 66 N.J. 401, 331 A.2d 612 (1975)). While the *Fellerman* court interpreted the term "fraud" as almost boundless, other courts have been more cautious. In *State v. Doster,* 276 S.C. 647, 284 S.E.2d 218, 220 (1981), the South Carolina Supreme Court explained that "the privilege does not extend to communications in furtherance of criminal, tortious or fraudulent conduct."

In *United Services Automobile Ass'n v. Werley,* 526 P.2d 28 (Alaska 1974), the Alaska Supreme Court adopted a broad view of the fraud exception. *Werley* stated that the attorney-client privilege does not apply when there is evidence that "an insurer through its attorney engage[d] in a bad faith attempt to defeat, or at least reduce, the rightful claim of its insured[.]" *Werley,* 526 P.2d at 33. Thus, under *Werley* mere evidence of bad-faith can defeat the attorney-client privilege. *But see Freedom Trust v. Chubb Group of Ins. Cos.,* 38 F.Supp.2d 1170, 1173 (C.D.Cal. 1999) ("[T]here is no persuasive reason to include bad faith in the fraud exception to the lawyer-client privilege."). Indeed, in the context of the exception, there are nearly as many definitions for the term "fraud" as there are courts tackling the issue. *See, e.g., In re Sealed Case,* 754 F.2d 395, 399 (D.C.Cir.1985) ("Communications otherwise protected by the attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud, or other misconduct."); *Cooksey v. Hilton Int'l Co.,* 863 F.Supp. 150, 151 (S.D.N.Y.1994) ("[T]orts moored in fraud can trigger the crime-fraud exception."); *Central Constr. Co. v. Home Indem. Co.,* 794 P.2d 595, 598 (Alaska 1990) (same); *Volcanic Gardens Mgmt. Co.,* 847 S.W.2d 343, 347 (" 'Fraud' is sometimes defined as '[a] generic term, embracing all multifarious means which human ingenuity can devise, and which are resorted to by one individual to get advantage over another by false suggestions or by suppression of truth, and includes all surprise, trick, cunning dissembling, and any unfair way by which another is cheated.' " (quoting *Johnson v. McDonald,* 170 Okla. 117, 39 P.2d 150 (1934))); *International Tel. & Tel. Corp. v. United Tel. Co. of Florida,* 60 F.R.D. 177, 180 (M.D.Fla.1973) ("The privilege may be overcome, not only where fraud or crime is involved, but also where there are other substantial abuses of the attorney-client relationship.").

While West Virginia has never expressly defined the scope of our fraud exception, in *State v. Douglass,* 20 W.Va. 770 (1882), this Court made clear that civil fraud may defeat the attorney-client privilege. In the more recent case of *Kessel v. Leavitt,* the Court

suggested that a narrow meaning should be afforded the fraud exception by commenting that "when the fraud alleged bespeaks of tortious fraudulent conduct, ... the ... fraud exception does not operate to compel disclosure of the privileged communications." *Kessel*, 204 W.Va. at 183, 511 S.E.2d at 808. This language, which is mere dicta, does not overrule the precedent set by this court in *Douglass*, and should not be interpreted to mean that civil fraud[2] is unavailable as a basis for piercing the attorney-client privilege. *Kessel* did not hold and should not be construed as holding, that evidence of other types of tortious conduct, like bad faith, could not be used to pierce the attorney-client privilege. Under the facts presented in *Kessel*, it was not necessary for the Court to define the scope of the fraud component of the crime-fraud exception. Consequently, the Court did not create a new syllabus point in *Kessel* that sought to define what type of evidence would be appropriate to establish the fraud exception. *See* Syl. pt. 2, in part, *Walker v. Doe*, 210 W.Va. 490, 558 S.E.2d 290 (2001) ("[N]ew points of law are ... articulated through syllabus points as required by our state constitution."). *Accord* Syl. pt. 13, *State ex rel. Medical Assurance of West Virginia v. Recht*, 213 W.Va. 457, 583 S.E.2d 80 (2003). As explained in *In re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959), "[o]biter dicta or strong expressions in an opinion, where such language was not necessary to a decision of the case, will not establish a precedent." *Kanawha Valley*, 144 W.Va. at 382–83, 109 S.E.2d at 669.

In the final analysis, *Kessel* does not limit the fraud exception to civil fraud, nor does the decision preclude using evidence of tor-

tious misconduct, such as bad faith, to help establish the civil fraud exception. This is an issue that the Court will have to resolve when properly presented for a resolution.

### 3. ESTABLISHING THE CRIME-FRAUD EXCEPTION

It is often difficult to prove the crime-fraud exception only with evidence independent of the privileged communication itself. "The best, and often only, evidence of whether the exception exists is the allegedly privileged communication." *In re Marriage of Decker*, 153 Ill.2d 298, 180 Ill.Dec. 17, 606 N.E.2d 1094, 1106 (1993). The United States Supreme Court addressed this issue in *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).[3]

In *Zolin*, the Supreme Court was asked to decide (1) whether a district court, at the request of the party opposing the attorney-client privilege, may review the allegedly privileged communications *in camera* to determine whether the crime-fraud exception applies; (2) whether some threshold evidentiary showing is needed before the district court may undertake the requested review; and (3) the type of evidence the opposing party may use to meet the threshold showing.[4]

As to the first issue, *Zolin* held that "the party opposing the privilege on crime-fraud grounds [may] rely[ ] on the results of an *in camera* review of the communications." *Zolin*, 491 U.S. at 568, 109 S.Ct. at 2629. As to the second issue, *Zolin* held that a party must establish through nonprivileged evidence, " 'a factual basis adequate to support a good faith belief by a reasonable person,' " that *in camera* review of the [privileged] materials may reveal evidence to establish the claim that the crime-fraud exception ap-

---

**2.** The elements of common law civil fraud were set out in Syllabus point 1 of *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981), as follows: The essential elements in an action for fraud are: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." *Horton v. Tyree*, 104 W.Va. 238, 242, 139 S.E. 737 (1927).

**3.** "[T]he attorney-client privilege is not itself constitutionally guaranteed." *State v. Bright*, 676 So.2d 189, 193 (La.Ct.App.1996). Consequently, the decision in *Zolin* is not binding on states.

**4.** For a discussion of *Zolin* in the context of tobacco litigation, *see* Ronald L. Motley and Tucker S. Player, *Issues in "Crime–Fraud" Practice and Procedure: The Tobacco Litigation Experience*, 49 S.C.L.Rev. 187 (1998).

plies." *Zolin,* 491 U.S. at 572, 109 S.Ct. at 2631 (quoting *Caldwell v. District Court,* 644 P.2d 26, 33 (Colo.1982)). In addressing the third issue, *Zolin* concluded "that the party opposing the privilege may use any nonprivileged evidence in support of its request for *in camera* review[.]" *Zolin,* 491 U.S. at 574, 109 S.Ct. at 2632.

There are three points I want to highlight regarding *Zolin.* First, under the decision in *Zolin,* a party may actually use a privileged communication to establish the crime-fraud exception. This point is critical because often-times a party will not be able to establish the crime-fraud exception without reliance upon the privileged communication. Second, *Zolin* permits the use of any nonprivileged evidence to establish a prima facie case of crime-fraud.[5] Under this standard, any type evidence showing misconduct (*e.g.,* bad faith), so long as it is not privileged, may be used to help support a prima facie case. Third, *Zolin's* threshold prima facie case, the proof necessary to trigger an *in camera* hearing, is not a high burden. The decision itself emphasized that "[t]he threshold we set . . . need not be a stringent one." *Zolin,* 491 U.S. at 572, 109 S.Ct. at 2631.[6] Thus, *Zolin's* threshold prima facie case "requires only a factual showing sufficient to support a reasonable good-faith belief that review of the privileged documents '*may reveal evidence* to establish that the crime fraud exception applies.'" *In re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir.1992) (quoting *Zolin,* 491 U.S. at 572, 109 S.Ct. at 2631 (emphasis in original)).[7] The *Zolin* prima facie showing to trigger an *in camera* review of the crime-fraud exception was adopted by this Court in *State v. Beard,* 194 W.Va. 740, 461 S.E.2d 486 (1995). In *Beard* we interpreted *Zolin* as requiring a party to "establish[ ] a *sufficient showing* to invoke the crime-fraud exception." *Beard,* 194 W.Va. at 754, 461 S.E.2d at 500 (emphasis added).

Once a prima facie case of the crime-fraud exception has been sufficiently established, the trial court may then conduct an *in camera* proceeding.[8] During the *in camera* review, the party opposing the privilege may

---

5. Although *Zolin* does not permit the use of privileged information to make out a prima facie case to trigger an *in camera* review of the privileged communication, *Zolin* does allow use of the communication if a court has not made an initial determination on the issue of privilege. In fact, this was the situation in *Zolin.* That is, in *Zolin,* the district court did not make an initial determination that the communication in question was privileged. Consequently, the Supreme Court held in *Zolin* that the communication could be used in making out a prima facie case of crime-fraud.

6. The majority of state courts addressing the issue have applied the prima facie evidence standard for triggering an *in camera* review of privileged communications. *See Pearce v. Stone,* 149 Ariz. 567; 720 P.2d 542 (Ct.App.1986); *State Farm Fire & Cas. Co. v. Superior Court,* 54 Cal. App.4th 625, 62 Cal.Rptr.2d 834 (1997); *Law Offices of Bernard D. Morley, P.C. v. MacFarlane,* 647 P.2d 1215 (Colo.1982); *American Tobacco Co. v. State,* 697 So.2d 1249 (Fla.Dist.Ct.App. 1997); *Wallace, Saunders, Austin, Brown & Enochs, Chartered v. Louisburg Grain Co.,* 250 Kan. 54, 824 P.2d 933 (1992); *Levin v. C.O.M.B. Co.,* 469 N.W.2d 512 (Minn.Ct.App.1991); *State ex rel. Peabody Coal Co. v. Clark,* 863 S.W.2d 604 (Mo.1993); *National Util. Serv., Inc. v. Sunshine Biscuits, Inc.,* 301 N.J.Super. 610, 694 A.2d 319 (App.Div.1997); *Kahn v. Pony Express Courier Corp.,* 173 Or.App. 127, 20 P.3d 837 (2001); *Arkla, Inc. v. Harris,* 846 S.W.2d 623 (Tex.Ct.

App.1993); *Lane v. Sharp Packaging Sys., Inc.,* 251 Wis.2d 68, 640 N.W.2d 788 (2002).

7. An *in camera* review is not necessary if a party's initial evidence is sufficient to establish the crime-fraud exception.

8. "[O]n a showing of a factual basis adequate to support a reasonable belief that an *in camera* review of the evidence may establish that the exception applies, the judge has discretion to conduct such an *in camera* review." *Purcell v. District Attorney,* 424 Mass. 109, 676 N.E.2d 436, 439 (1997). *See also Lane v. Sharp Packaging Sys., Inc.,* 251 Wis.2d 68, 640 N.W.2d 788, 809 (2002) ("[T]he decision to conduct an *in camera* review is a discretionary decision."). It has been said that "[o]nce the threshold showing is made to allow *in camera* review, courts should make the decision to review in light of the amount of material they have been asked to review, the relevance of the alleged privilege material to the case, and the likelihood that *in camera* review will reveal evidence to establish the applicability of the crime-fraud exception." *In re Grand Jury Investigation,* 974 F.2d 1068, 1072–73 (9th Cir.1992). Moreover, a "court· is also free to defer its *in camera* review if it concludes that additional evidence in support of the crime-fraud exception may be available that is not allegedly privileged, and that production of the additional evidence will not unduly disrupt or delay the proceedings." *Zolin,* 491 U.S. at 572, 109 S.Ct. at 2631.

prevail only where the evidence establishes "that the client intended to perpetrate a [crime or] fraud," *Olson v. Accessory Controls & Equip. Corp.*, 254 Conn. 145, 757 A.2d 14, 31 (2000).[9] In addition, "the court must find a valid relationship between the confidential communication that was made and the crime or fraud." 1 Franklin D. Cleckley, *Handbook on Evidence* § 5–4(E)(6)(a) (1994).[10]

Although the United States Supreme Court found in *Zolin* that "the party opposing the privilege on crime-fraud grounds [may] rely[ ] on the results of an *in camera* review of the communications," *Zolin*, 491 U.S. at 568, 109 S.Ct. at 2629, the Supreme Court did "not decide the quantum of proof necessary ultimately to establish the applicability of the crime fraud exception." *Zolin*, 491 U.S. at 563, 109 S.Ct. at 2626.[11] The West Virginia Supreme Court has never directly addressed the issue of the standard of proof for establishing the crime-fraud exception.[12] Courts that have addressed the issue are split. A majority of state courts have held that the crime-fraud exception may be proven by "prima facie" evidence.[13] *See Matter of Mendel*, 897 P.2d 68, 74 (Alaska 1995) (prima facie evidence standard); *State v. Fodor*, 179 Ariz. 442, 880 P.2d 662, 670 (App.1994) (same); *State Comp. Ins. Fund v. Superior Court*, 91 Cal.App.4th 1080, 111 Cal.Rptr.2d 284, 291 (2001) (same); *People v. Board*, 656 P.2d 712, 714 (Colo.Ct.App.1982)

(same); *In re Marriage of Decker*, 153 Ill.2d 298, 180 Ill.Dec. 17, 606 N.E.2d 1094, 1105 (1993) (same); *Lahr v. State*, 731 N.E.2d 479, 483 (Ind.Ct.App.2000) (same); *Wallace, Saunders, Austin, Brown & Enochs, Chartered v. Louisburg Grain Co., Inc.*, 250 Kan. 54, 824 P.2d 933, 939 (1992) (same); *State ex rel. Humphrey v. Philip Morris Inc.*, 606 N.W.2d 676, 691 (Minn.Ct.App.2000) (same); *State ex rel. Peabody Coal Co. v. Clark*, 863 S.W.2d 604, 608 (Mo.1993) (same); *Ocean Spray Cranberries, Inc. v. Holt Cargo Sys., Inc.*, 345 N.J.Super. 515, 785 A.2d 955, 959 (Law Div.2000) (same); *Matter of Grand Jury Subpoena of Stewart*, 144 Misc.2d 1012, 545 N.Y.S.2d 974, 980 (1989) (same); *In re Investigating Grand Jury of Philadelphia County*, 527 Pa. 432, 593 A.2d 402, 407 (1991) (same); *Kugle v. DaimlerChrysler Corp.*, 88 S.W.3d 355, 362 (Tex.App.2002) (same); *Lane v. Sharp Packaging Sys., Inc.*, 251 Wis.2d 68, 640 N.W.2d 788, 807 (2002) (same). One state court uses a probable cause standard. *See Olson v. Accessory Controls & Equip. Corp.*, 254 Conn. 145, 757 A.2d 14, 31 (2000). At least three state courts use a preponderance of the evidence standard. *See American Tobacco Co. v. State*, 697 So.2d 1249, 1256 (Fla.Dist.Ct.App.1997) (preponderance of the evidence standard); *Stidham v. Clark*, 74 S.W.3d 719, 727 (Ky.2002); (same) *Purcell v. District Attorney*, 424 Mass. 109, 676 N.E.2d 436, 439 (1997) (same).

9. "To overcome a claim of privilege using the fraud exception, the seeker of the documents does not have to prove that a fraud has actually taken place." *Dixon v. Bennett*, 72 Md.App. 620, 531 A.2d 1318, 1329 (Md.Ct.Spec.App.1987).

10. "The party asserting the privilege may also have an opportunity to demonstrate why, in light of the discovering party's prima facie case, the privilege should remain intact." *Kessel*, 204 W.Va. at 183, 511 S.E.2d at 808.

11. *Zolin* did make clear that "a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege." *Zolin*, 491 U.S. at 572, 109 S.Ct. at 2631.

12. As a general matter, this Court has held that "[a] party seeking to prove fraud ... must do so by clear and convincing evidence[.]" Syl. pt. 2, in part, *Lutz v. Orinick*, 184 W.Va. 531, 401 S.E.2d 464 (1990). I doubt that the "clear and

convincing evidence" standard would be required for establishing the crime-fraud exception to the attorney-client privilege.

13. There is no single test for what may constitute prima facie evidence. Some courts suggest that "[p]rima facie evidence denotes evidence which, if left unexplained or uncontradicted, would be sufficient to carry the case to the jury and sustain a verdict in favor of the plaintiff on the issue it supports." Syl. pt. 3, *Baker v. City of Garden City*, 240 Kan. 554, 731 P.2d 278 (1987). In the context of a prima facie case of negligence, this Court has held that " '[a] prima facie case of actionable negligence is that state of facts which will support a jury finding that the defendant was guilty of negligence which was the proximate cause of plaintiff's injuries[.]' " Syl. pt. 12, in part, *Antco, Inc. v. Dodge Fuel Corp.*, 209 W.Va. 644, 550 S.E.2d 622 (2001) (quoting Syl. pt. 6, *Morris v. City of Wheeling*, 140 W.Va. 78, 82 S.E.2d 536 (1954)).

Federal courts employ the prima facie evidence standard, but utilize a variety of different terminology to describe that standard of proof. *See, e.g., In re Sealed Case,* 107 F.3d 46, 50 (D.C.Cir.1997) (evidence that, if believed by the trier of fact, would establish the elements of an ongoing or imminent crime or fraud); *In re Grand Jury Proceedings,* 87 F.3d 377, 381 (9th Cir.1996) (reasonable cause to believe attorney was used in furtherance of ongoing scheme); *United States v. Davis,* 1 F.3d 606, 609 (7th Cir.1993) (evidence presented by the party seeking application of the exception sufficient to require the party asserting the privilege to come forward with its own evidence to support the privilege); *Haines v. Liggett Group Inc.,* 975 F.2d 81, 95–96 (3d Cir.1992) (evidence that, if believed by the fact finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met); *In re Grand Jury Investigation,* 842 F.2d 1223, 1226 (11th Cir.1987) (evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed); *In re International Sys. & Controls Corp. Sec. Litig.,* 693 F.2d 1235, 1242 (5th Cir.1982) (evidence such as will suffice until contradicted and overcome by other evidence). Two federal appellate courts utilize a probable cause standard. *See In re Richard Roe, Inc.,* 68 F.3d 38, 40 (2d Cir.1995) (probable cause standard); *In re Antitrust Grand Jury,* 805 F.2d 155, 166 (6th Cir.1986) (same).

### 4. ASSERTING THE CRIME–FRAUD EXCEPTION IN INSURANCE BAD FAITH CASES

The question of whether a plaintiff may invoke the crime-fraud exception, to obtain privileged communications in an insurance bad faith case, has never been squarely addressed by this Court. The majority of courts that have been confronted with the question have held that the crime-fraud exception may be invoked in insurance bad faith litigation. *See Freedom Trust v. Chubb Group of Ins. Cos.,* 38 F.Supp.2d 1170 (C.D.Ca.1999) (first-party bad faith); *Ekeh v.*

*Hartford Fire Ins. Co.,* 39 F.Supp.2d 1216 (N.D.Ca.1999) (third-party bad faith); *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.,* 173 F.R.D. 7 (D.Mass.1997) (first-party bad faith); *Ring v. Commercial Union Ins. Co.,* 159 F.R.D. 653 (M.D.N.C.1995) (first-party bad faith); *United Servs. Auto. Ass'n v. Werley,* 526 P.2d 28 (Alaska 1974) (first-party bad faith); *State Farm Fire & Cas. Co. v. Superior Court,* 54 Cal.App.4th 625, 62 Cal.Rptr.2d 834 (1997) (first-party bad faith); *Escalante v. Sentry Ins.,* 49 Wash.App. 375, 743 P.2d 832 (1987) (third-party bad faith), *disapproved on other grounds by Ellwein v. Hartford Acc. and Indem. Co.,* 142 Wash.2d 766, 15 P.3d 640 (2001). At least one court has expressly declined to allow the crime-fraud exception to be used to obtain attorney-client communication in an insurance bad faith case. *See State v. Second Judicial Dist. Court,* 240 Mont. 5, 783 P.2d 911, 916 (1989) ("We reject the reasoning of those cases, which would extend the civil fraud exception to bad faith allegations.").

Application of the crime-fraud exception in bad faith litigation has been justified on the grounds "that attorney-client communications should not be protected when they pertain to ongoing or future fraudulent conduct by the insurer." *Escalante,* 743 P.2d at 842. In other words, *Escalante* has determined that the traditional justification for invoking the crime-fraud exception extends to bad faith litigation. I agree with *Escalante* insofar as I conceive of no legitimate reason for refusing to extend the crime-fraud exception to bad faith litigation.

The decision in *United Services Automobile Association v. Werley,* 526 P.2d 28 (Alaska 1974), provides a good illustration of the type of proof found to be acceptable for establishing the fraud component of the crime-fraud exception to the attorney-client privilege in an insurance bad faith action. *Werley* involved a first-party bad faith action brought against an insurer. The plaintiff, who was injured in an auto accident, filed a bad faith claim when his insurer refused to provide uninsured motorist coverage.[14] During discovery, the plaintiff requested docu-

---

14. The case is far more complex than I have stated, but for the sake of clarity, I have omitted discussion regarding other plaintiffs and other causes of action filed in the case.

ments that the insurer claimed were protected from disclosure by the attorney-client privilege. The trial court ordered the documents be turned over to the plaintiff. The insurer filed a petition with the Alaska Supreme Court seeking review of the trial court's order requiring disclosure of privileged information.

The Alaska Supreme Court found that, while the documents were protected by the attorney-client privilege, the plaintiff had produced sufficient evidence to satisfy the fraud exception. In affirming the trial court's decision, *Werley* held that the plaintiff's "prima facie evidence of fraudulent conduct consists of a demonstration that the [two] defenses urged by [the insurer] in opposition to his claim for $30,000 were, on their face, devoid of any merit." *Werley*, 526 P.2d at 33. In other words, under *Werley* an "insurer's allegedly tortious conduct in asserting bad faith defenses against a claim for coverage constitute[s] 'civil fraud,' and . . . the attorney-client privilege [will] not protect communications between an attorney and her client relating to that fraud." *Munn v. Bristol Bay Hous. Auth.*, 777 P.2d 188, 195 (Alaska 1989).

In view of the foregoing, I concur.

ALBRIGHT, Justice, concurring.

(Filed June 17, 2003)

I concur in the judgment rendered and the carefully crafted opinion underlying that judgment. I write briefly to give emphasis to three points.

First, the suit before us involves a claim of alleged bad faith on the part of an insurance company in the handling of an underlying claim or lawsuit. Accordingly, the matters of attorney-client or quasi attorney-client privilege addressed in the opinion should not be at issue before the underlying claim or lawsuit has been resolved. Once that underlying claim or lawsuit has been resolved and attention is turned to allegations of bad faith in the handling of that underlying claim, the attention of the court and parties turns from the merits of the underlying claim to whether the evidence supports the allegations of bad faith on the part of the insurance company in the handling of the underlying claim. At that juncture, the fundamental factual question is *what did the insurance company know about the underlying claim and its liability to pay indemnity, and when did the insurance company know it*. Given that fundamental factual inquiry, the potential exposure to discovery and disclosure of the insurance company's internal work product and internal attorney-client communications during the company's handling of the underlying claim presents somewhat different issues than those which arise during the pendency of the underlying claim.

Second, I believe that the attorney-client privilege is so central to our system of both civil and criminal justice that it deserves absolute protection during the pendency of the underlying claim and should be breached or circumscribed in the context of a bad faith claim upon the clear showings required by the majority opinion—including those of need, relevancy, and unavailability elsewhere. In specific areas of federal law (e.g., tax law, securities regulation, RICO prosecutions) it has become frequent, if not commonplace, to breach those privileges ever more freely, all in the name of full and fair enforcement of the law. Moreover, sound ethical considerations have motivated the organized bar to carefully craft specific exceptions to and waivers of the privilege. I trust, and have concluded, that the Court's opinion in the instant case is well within the conceptual boundaries of those previously defined exceptions and waivers. In short, it appears to me that today's opinion does not extend the law of exception and waiver as far as have other courts and agencies in similar situations.

Third, all of that being said, the ultimate fairness and practical usefulness of our decision today depends upon the special skill, careful consideration and innate sense of fairness which the trial judges of this state bring to bear on the consideration of requests made in the future under the authority of this decision. It is dependent as well upon the special skill, careful consideration and innate sense of fairness which those trial judges bring to bear on the arduous task our opinion assigns those judges for the review of documents for which discovery is sought not-

withstanding claims of privilege. We have thus placed on the trial judges a very heavy burden to study and classify perhaps hundreds of documents in the more complex cases. We earnestly hope that trial counsel in this and similar cases will assist in keeping that heavy burden at least bearable by not submitting discovery requests or responses other than those counsel clearly finds essential either to the proper prosecution or proper defense of the action being litigated.

McGRAW, J., dissenting.

(Filed July 2, 2003)

I dissent from the majority opinion in this case because I believe the time-honored sanctity of the attorney-client privilege should not be shamelessly invoked to shield an insurer's tortious conduct, the aim of which is to defeat an injured party's legitimate claim. Though the majority states otherwise, there is simply no substitute for the discovery of material generated contemporaneously with the handling of a claim and for the sole purpose of denying a claim. Justice Davis, who has authored a concurring opinion in this case, elaborates extensively in this regard and, in my view, makes an excellent argument for *denying* the Respondent insurer's petition for writ of prohibition. Therefore, for the reasons stated above and in Justice Davis' concurring opinion, I respectfully dissent.

STARCHER, C.J., concurring.

(Filed July 11, 2003)

I agree with the general principles of law adopted by the majority opinion. I write separately to expound upon the general law in the area of the attorney-client privilege and work product doctrine when a party is seeking through discovery to examine an insurance company's claim file. I wish to make clear that, despite our ruling in favor of the insurance company in this case, our holding does not preclude the discovery of the vast majority of the information contained in the Medical Assurance claim file in this case.

Before discussing this law, I wish to note that the circuit court's interpretation of this Court's suggestion in footnote 8 of *Honaker v. Mahon,* 210 W.Va. 53, 62, 552 S.E.2d 788, 797 (2001) was laudable and well-intentioned, but stretched the language of the footnote somewhat farther than intended. In *Honaker,* the plaintiff was tied up in several years of litigation with her own insurance company over underinsured motorist coverage. Near the end of the trial, the attorney for the insurance company violated a pretrial order excluding certain evidence, a tactic the plaintiff argued was an attempt to "flush a losing case down the drain at plaintiff's expense." *Id.*

Our holding in footnote 8 was intended as a warning to insurance companies, and the attorneys representing those insurance companies, that *in first-party claims* the misconduct of the attorney retained on behalf of the insurance company is just as actionable as if it were done by a full-time employee of the insurance company. This warning does not, however, apply with equal force in third-party claims like that found in the instant case, because while the attorney might be paid by the insurance company, the attorney's first duty is to the client and not the insurance company.

### A.

### *The Attorney–Client Privilege and Work–Product Privilege—Generally*

The attorney-client privilege was stated in a widely quoted definition by Judge Wyzanski:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950). The attorney-client privilege applies only to attorney-client communications, and is "in-

tended as a shield, not a sword." 8 Wigmore § 2327. The privilege may therefore be deemed waived where the party asserting the privilege, in the course of litigation, raises an issue the effective rebuttal of which requires inquiry into privileged communications.

The work product rule is distinct from and broader than the attorney-client privilege. It extends to all documents and tangible things prepared by or for a client, the client's attorney, or their agents in anticipation of litigation or for trial, rather than merely protecting confidential communications between the attorney and his or her client. Rule 26(b)(3) of the *Rules of Civil Procedure* states that the work product doctrine provides qualified immunity for documents and tangible things. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) extends the reach of the doctrine beyond documents and tangible things to "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways." 329 U.S. at 511, 67 S.Ct. 385.

"The work product rule does not extend to every written document generated by an attorney; it does not shield from disclosure everything that a lawyer does. Its purpose is more narrow, its reach more modest. . . . [T]he purpose of the privilege is to encourage effective legal representation *within the framework of the adversary system* by removing counsel's fears that his thoughts and information will be invaded by his adversary." *Jordan v. United States Department of Justice,* 591 F.2d 753, 775 (D.C.Cir. 1978)(*en banc* ).

The attorney-client privilege belongs to the client alone; the work product immunity belongs to both the attorney and the client.

### B.

*Reasoning Courts Use to Find that the Attorney–Client Privilege is Waived as to Information Contained in an Insurance Claim File*

1. *The insured-tortfeasor is a client of the attorney who may waive the privilege.*

It is axiomatic that the tortfeasor-insured—in this case, Dr. Ghaphery—would be a client of the defense attorney, entitled to examine any documents prepared by his own defense attorney. So, if the tortfeasor sued the insurance company to recover the excess verdict, the disputed documents to and from his own attorney would be discoverable, but that is not what happened in this case.

The general rule is that where two parties are represented by the same attorney for their mutual benefit, the communications between the parties are not privileged in a later action between those parties or their representatives. Hence, the tortfeasor-insured can sue his insurance company for an excess verdict and waive the attorney-client privilege as to materials created by his own attorney. *See, e.g., Chitty v. State Farm Mut. Auto. Ins. Co.,* 36 F.R.D. 37 (E.D.S.C.1964) (tortfeasor-insured sued insurance company for bad faith after plaintiff recovered verdict $25,000.00 in excess of policy limits; trial court ordered production of entire claims file over objection of attorney-client privilege); *LaRocca v. State Farm Mut. Auto. Ins. Co.,* 47 F.R.D. 278 (W.D.Pa.1969) (tortfeasor-insured sued insurance company for bad faith after plaintiff recovered excess verdict; court held where attorney acts for two parties, communications from either are not privileged from disclosure to the other, and ordered production of defense attorney's files); *Netzley v. Nationwide Mut. Ins. Co.,* 34 Ohio App.2d 65, 296 N.E.2d 550 (1971)(tortfeasor-insured sued insurance company for bad faith when plaintiff recovered verdict $50,000.00 in excess of policy limits; defense attorney was assigned to represent the tortfeasor-insured by the insurance company, so the tortfeasor should therefore be allowed access to the defense attorney's files). *See also, Layton v. Liberty Mut. Fire Ins. Co.,* 98 F.R.D. 457 (E.D.Pa.1983) (plaintiff-passenger sued defendant insured driver for accident with an uninsured motorist; insurance company paid for insured's defense attorney; insured later sued the insurance company claiming bad faith failure to pay uninsured motorist benefits to insured; insured entitled to discovery of defense attorney's files).

Unfortunately for the plaintiff, Dr. Ghaphery has not—as of yet—chosen to waive the attorney-client privilege in this case.

### 2. *Waiver of the privilege by the injured plaintiff, Theory One*

If an injured plaintiff obtains an excess judgment against a tortfeasor, the plaintiff may then waive the tortfeasor's attorney-client privilege if the tortfeasor assigns his bad faith cause of action to the plaintiff. Once the tortfeasor-insured signs over his cause of action for bad faith to the plaintiff, the plaintiff formally stands in the shoes of the tortfeasor and can waive the tortfeasor's attorney-client privilege. *Simpson v. Motorists Mut. Ins. Co.*, 494 F.2d 850 (7th Cir. 1974) (tortfeasor assigned cause of action to plaintiff; plaintiff stood in tortfeasor's shoes and could waive any attorney-client privilege as to insurance company claim file); *Hartford Fire Ins. Co. v. Masternak*, 55 A.D.2d 472, 390 N.Y.S.2d 949 (1977) (*per curiam*) (plaintiff-daughter sued Mom and Dad after tripping down family stairs; Mom and Dad refused to claim attorney-client privilege, and insurance company sought to void homeowner's liability policy for "lack of cooperation"); *Glacier General Assurance Co. v. Superior Court of Los Angeles Co.*, 95 Cal. App.3d 836, 157 Cal.Rptr. 435 (1979) (tortfeasor assigned excess judgment cause of action to plaintiff; plaintiff entitled to discovery of communications between tortfeasor's attorney and insurance company); *Catino v. Travelers Ins. Co. Inc.*, 136 F.R.D. 534 (D.Mass.1991).

Again, such is not the scenario in this case.

### 3. *Waiver of the privilege by the injured plaintiff, Theory Two*

Several courts, the minority view, hold that the plaintiff is a third-party beneficiary of the insured-insurance company contract. Therefore, even without an assignment of a bad faith cause of action by the insured-tortfeasor, the plaintiff stands in the tortfeasor's shoes and can waive the attorney-client privilege in a bad faith action and obtain discovery of attorney-client materials in the claims file. *Boston Old Colony Ins. Co. v. Gutierrez*, 325 So.2d 416 (Fla.App.3d 1976); *Dunn v. National Sec. Fire & Cas. Co.*, 631 So.2d 1103 (Fla.App.5th 1993). Federal courts in two states applying state law reached the same conclusions. *Shapiro v. Allstate Ins. Co.*, 44 F.R.D. 429 (E.D.Pa.1968) (third-party plaintiff stands in shoes of the tortfeasor and can waive attorney-client privilege to insurance company claim file); *Bourget v. Government Employees Ins. Co.*, 48 F.R.D. 29 (D.Conn.1969) (same).

Nor is this view applicable to the facts of this case.

### 4. *The attorney-client privilege only attaches to attorney-client communications not the actions of the attorney*

The information in the claim file that was passed between the attorney and the insurance company must actually meet the definition of attorney-client privileged information. While this approach usually requires a careful analysis of the materials allegedly protected by the attorney-client privilege, the analysis can be bypassed if the party is asserting that *actions of the attorney* are privileged. For instance, if an attorney acts as a claims adjuster rather than an attorney, the documents generated by the attorney are not privileged. *See, e.g., Mission National Ins. Co. v. Lilly*, 112 F.R.D. 160 (D.Minn.1986) (insurance company's law firm hired as a matter of course to conduct investigation of any claims exceeding $25,000.00; law firm investigated plaintiff's claim and recommended claim be denied; because the attorney-client privilege would allow a "blanket obstruction to discovery of [the] claims investigation," to the extent the attorneys acted as claims adjusters their communications and work product would be discoverable by plaintiff in a bad faith action).

It is unclear if this occurred in this case.

### 5. *The attorney-client privilege is to be narrowly construed*

West Virginia law is clear that the attorney-client privilege is to be given a strict, narrow interpretation. "Privileged" material is only that material which contains confidential communications made to an attorney. Syllabus Point 7, *State ex rel. U.S.F. & G. v. Canady*, 194 W.Va. 431, 460 S.E.2d 677 (1995). Hence, each line of each document can be evaluated to determine whether the document is actually discussing a privileged communication between the client and the attorney. Then, the privileged material can be redacted. Normally discoverable facts

cannot be hidden by the attorney-client privilege.

An example of strict construction is found in *Loftis v. Amica Mut. Ins. Co.*, 175 F.R.D. 5 (D.Conn.1997), where the injured plaintiff recovered a verdict of $3.8 million, in excess of the tortfeasor's $300,000.00 policy. In a subsequent bad faith action against the insurance company, the plaintiff sought to discover a letter from the tort claim defense attorney to the insurance company. The court held that the letter to the insurance company contained the attorney's advice and opinions, and was certainly opinion work product. However, the letter failed to contain "confidences" of the client. Because the letter did not reveal any client confidences, the letter was not protected by the attorney-client privilege.

### 6. *Bad faith conduct by an insurance company constitutes civil fraud that waives the attorney-client privilege*

As Justice Davis more eloquently states in her separate opinion, some states hold that bad faith by an insurance company rises to a level of civil fraud; therefore, an insurance company may by its actions engage in civil fraud and waive the attorney-client privilege under the crime-fraud exception. *United Services Automobile Association v. Werley*, 526 P.2d 28 (Alaska 1974)(where plaintiff made *prima facie* showing of bad faith in first-party claim for uninsured motorist benefits, insurance company voided attorney-client privilege); *Caldwell v. District Court*, 644 P.2d 26 (Colo.1982) (plaintiff in third-party claim entitled to discovery of defense attorney's files where defendants engaged in civil fraud to conceal evidence implicating deep-pocket defendants; plaintiff need only show "a foundation in fact for the charge" of bad faith to show civil fraud and waiver of the attorney-client privilege); *Escalante v. Sentry Ins.*, 49 Wash.App. 375, 743 P.2d 832 (1987) (follows *Caldwell*, requiring foundation in fact of bad faith to establish civil fraud and overcome claims of attorney-client privilege in first-party claim). *See also, In re Bergeson*, 112 F.R.D. 692 (D.Mont.1986)(citing to *Caldwell* and *Werley* for proposition that claim file must be produced to first-party insured in bad faith action failure to pay fire insurance benefits, without discussing the crime-fraud exception) and *Silva v. Fire Insurance Exchange*, 112 F.R.D. 699 (D.Mont. 1986) (same, citing to *In re Bergeson* ). *See generally,* David J. Fried, *Too High a Price for Truth: The Exception to the Attorney–Client Privilege for Contemplated Crimes and Frauds,* 64 N.C.L.Rev. 443 (1986).

### C.

### *Reasoning Used to Overcome the Work Product Doctrine*

### 1. *The disputed materials were not prepared in anticipation of litigation*

The first step in any work product analysis is to ask, "are the documents or tangible things work product?" Work product consists of materials produced in anticipation of litigation. There are numerous approaches used by courts to determine whether documents in insurance claims files are created in anticipation of litigation, generally summarized down to three approaches: never work product, always work product, or case-by-case analysis focused on the primary purpose behind the creation of the documents or tangible things.

*Thomas Organ v. Jadranska Slobodna Plovidba,* 54 F.R.D. 367 (N.D.Ill.1972) represents one extreme, holding that documents produced in the ordinary course of business are discoverable, such as the reports on adjusting claims that insurance companies produce on a daily basis. Hence, unless the documents are created by an attorney or at an attorney's direction, the documents in the insurance company claim file are never protected by work product. *See also, Atlanta Coca–Cola Bottling Co. v. Transamerica Ins. Co.,* 61 F.R.D. 115, 118 (N.D.Ga.1972) (court held that "the evaluation of claims of [an insurance company's] policyholders is the regular, ordinary and principal business of defendant insurance company. Most of such claims result in payment by the defendant; it can hardly be said that the evaluation of a routine claim from a policyholder is undertaken in anticipation of litigation. . . .")

*Thomas Organ* has been criticized because Rule 26(b)(3) specifically allows reports generated by "representatives" to be protected, if prepared in anticipation of litigation. The backlash case is *Almaguer v. Chicago, Rock*

*Island & Pacific R.R. Co.,* 55 F.R.D. 147 (D.Neb.1972), where the court held that "statements taken by a claim agent immediately after an accident are taken in anticipation of litigation...." Hence, the court held that everything an insurance company does is protected by the work product doctrine.

Most courts use a case-by-case method, looking to when it appeared to the creator of the material that litigation was imminent. "While litigation often results from an insurance company's denial of a claim, it cannot be said that any document prepared by an insurance company after such a claim has arisen is prepared in anticipation of litigation.... That is not to suggest that *all* documents prepared by an insurance company in investigating a claim, are, by definition, compiled in the ordinary course of business and, thus, automatically subject to discovery." *APL Corp. v. Aetna Cas. & Surety Co.,* 91 F.R.D. 10, 17–18 (D.Md.1980).

The court in *Harper v. Auto–Owners Ins. Co.,* 138 F.R.D. 655 (S.D.Ind.1991) set out a solid two-part test for determining whether documents are work product: reasonable anticipation, and causation. First, a prudent party anticipates litigation, but there must be more than a "remote prospect," "inchoate possibility," or "likely chance" of litigation. There must be a substantial and specific threat of litigation before a party's anticipation of litigation will be considered a reasonable and justifiable motivating force behind creating a document. 138 F.R.D. at 659–60. Second, the disputed document must have been produced because of the prospect of litigation and for no other purpose. "In anticipation" must not be read broadly; documents that would have been produced in the regular course of business are outside the scope of work product. *Id.* at 660–61. Also, the work product doctrine does not depend solely on the fact that a document was produced after a certain point in time (such as the date the insurance company learned the plaintiff hired an attorney); routine reports are still not work product. *See also, Stout v. Illinois Farmers Ins. Co.,* 150 F.R.D. 594 (S.D.Ind.1993) (holding that a document is work product only if its primary purpose for creation was for litigation).

Insurance companies routinely assert that investigative reports are prepared in antici-

pation of litigation. The fact that litigation ensues does not make a document in the claims file "work product" prepared in anticipation of litigation. As one court stated in compelling the production of a claims file over a work product objection, "the investigation of potential claims is an integral part of the insurer's business. Investigations are made regularly and in the ordinary course of business. They are necessary if the companies are to make intelligent dispositions of claims. They are necessary also if a carrier is to perform adequately the duties and obligations towards its insureds which are imposed upon it by law." *Henry Enterprises, Inc. v. Smith,* 225 Kan. 615, 592 P.2d 915, 921 (1979).

Incidentally, merely because documents are created by a lawyer does not make the documents protected by the work product doctrine. In *Western Nat. Bank of Denver v. Employers Ins. of Wausau,* 109 F.R.D. 55 (D.Colo.1985), the insurance company hired a law firm to conduct a factual investigation of misconduct by the insured-bank's employees. The trial court held that the law firm did not generate work product, but rather generated ordinary insurance investigative claim files prepared in the course of business. Hence, the plaintiff-bank was entitled to discover the law firm's files in a bad faith claim against the insurance company. *See also, Mission National Ins. Co. v. Lilly,* 112 F.R.D. 160 (D.Minn.1986) (insurance company hired law firm as matter of course to direct investigation of any claim with loss exceeding $25,000.00; to the extent the law firm acted as claims adjusters, their work product would be treated as created in the ordinary business of the insurance company, outside the attorney-client and work product privileges).

Some variation of this middle approach is followed by most courts, and is more defensible than the other two extremes.

2. *"Substantial need" for the work product and an inability "without undue hardship to obtain the substantial equivalent of the materials by other means."*

As the majority opinion finds, work product is discoverable upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship.

A minority of courts hold that the materials in an insurance company claim file are protected by the work product doctrine, and cannot be discovered. *See Ex parte Bozeman,* 420 So.2d 89 (Ala.1982) (plaintiff did not show substantial need by asserting the claims file documents were needed for impeachment of insurance adjuster); *Carver v. Allstate Ins. Co.,* 94 F.R.D. 131 (S.D.Ga.1982) (plaintiff did not show undue hardship in obtaining the substantial equivalent of the claims file, because the plaintiff could depose insurance company employees about their actions and opinions); *Ring v. Commercial Union Ins. Co.,* 159 F.R.D. 653 (M.D.N.C.1995) (Rule 11 requires a plaintiff to have a basis in fact for making an allegation; therefore, plaintiff should not need claims file to make a bad faith allegation; besides, adjusters could be deposed to learn the facts, so no need or undue burden shown for work product); *Dixie Mill Supply Co., Inc. v. Continental Casualty Co.,* 168 F.R.D. 554 (E.D.La.1996) (follows *Ring* ).

The majority view held by courts generally follows *Brown v. Superior Court In and For Maricopa County,* 137 Ariz. 327, 670 P.2d 725 (1983), a first party bad faith case arising from the insurance company's refusal to pay business interruption benefits after the plaintiff's business burned. The court held that the question in a bad faith claim is whether the insurance carrier acted reasonably, and

> ... the substantial equivalent of [the claims file] material cannot be obtained through other means of discovery. The claims file "diary" is not only likely to lead to evidence, but to be very important evidence on the issue of whether [the insurance company] acted reasonably.

The Court held that the "strategy, theories, mental impressions and opinions of Continental's agents ... are directly at issue." Therefore, any work product material pertaining to the opinions of the claims agents was discoverable.

Similarly, in *Reavis v. Metropolitan Property & Liability Ins. Co.,* 117 F.R.D. 160 (S.D.Cal.1987), the insurance company objected to production of the claims file alleging certain materials were work product. The court stated that the "tort of bad faith goes to the reasonableness of Metropolitan's handling of Reavis' claim. It is apparent that the claims files contain a detailed history of how Metropolitan processed and considered Reavis' claim; under these circumstances, the documents are certainly relevant to the issues raised...." 117 F.R.D. at 164. The court did hold that opinion or mental work product is afforded greater protection, but such protection should not be absolute. The adjusters for the insurance company "will probably testify at trial concerning the steps they took and the conclusions and opinions they had regarding Reavis' claim. In order to effectively cross-examine these witnesses, Reavis will need to know upon what facts the conclusions were based. The documents reflected in the claims file will give Reavis this information." *Id.* at 164–65. *See also, Hartman v. Banks,* 164 F.R.D. 167 (E.D.Pa.1995) (third-party claim; insurance company objected to producing file on grounds of work product; when compelled, in a "display of considerable chutzpah" company produced documents with entire contents redacted; court ruled unredacted documents should be produced, stating "The [claims] file kept by Nationwide may well contain crucial evidence on the central issues in the case—the state of mind and behavior of Nationwide officials."). *See also,* Thomas E. Workman, *Plaintiff's Right to the Claim File, Other Claim Files and Related Information: The Ticket to the Gold Mine,* 24 Tort & Ins. L.J. 137 (1988); Note, *Work Product Discovery: A Multifactor Approach to the Anticipation of Litigation Requirement in Federal Rule of Civil Procedure 26(b)(3),* 66 Iowa L.Rev. 1277 (1981); Woodward, *Insurance Companies and Work Product Immunity Under Indiana Trial Rule 26(b)(3): Indiana Adopts a Fact–Sensitive Approach,* 19 Ind. L.Rev. 139 (1986); Mary Beth Brookshire Young, *The Work Product Doctrine: Functional Considerations and the Question of the Insurer's Claim File,* 64 U.Chi.L.Rev. 1425 (1997); Jeff A. Anderson, *et al., The Work Product Doctrine,* 68 Cornell L.Rev. 760 (1983); Kevin M. LaCroix, *The Work Product Doctrine and Claim File Discovery: The Insurer's Perspective,* Inside Litigation 24 (March 1992); Randy S. Parlee, *Accessing Insurance Company Claim Files,* 65 Wisconsin Lawyer 10 (September 1992).

On remand, as to any work product contained in the Medical Assurance claim file,

the circuit court should consider whether the plaintiff has shown a substantial need for information sought that is allegedly protected by the work-product privilege, and if so whether the plaintiff is unable without undue hardship to obtain the substantial equivalent of the information by other means.

The plaintiff is attempting to show that Medical Assurance's decision to deny the plaintiff's request to settle within policy limits was unreasonable, and the record suggests that the documents in the Medical Assurance claim file are the only contemporaneous record of Medical Assurance's decision process. The necessity for the claim file documents therefore appears to be substantial. However, whether these documents could be obtained from another source without undue hardship is not clear from the record, and should be resolved by the circuit court.

I otherwise respectfully concur with the majority's decision.